**JOHNSON v. LOUISVILLE & N. R. CO.**
**et al.**

**7 Div. 95.**

Supreme Court of Alabama.

April 6, 1933.

Rehearing Granted May 25, 1933.

Rehearing Denied June 22, 1933.

W. A. Denson, of Birmingham, for appellant.

W. W. Wallace, of Columbiana, and White E. Gibson and M. Leigh Harrison, both of Birmingham, for appellees.

BROWN, Justice.

This is an action on the case by the appellant, Alton C. Johnson, against the appellees, Louisville & Nashville Railroad Company and its engineer, W. J. Weaver, for personal injuries alleged to have been inflicted on plaintiff as a proximate consequence of the negligence of said Weaver.

The plaintiff withdrew counts 1 and 2 of the complaint, leaving in the complaint counts A and B. Count A, after stating matters of inducement, averring that plaintiff received his injuries in consequence of a collision of plaintiff's automobile and defendant's train, and cataloguing the injuries suffered, avers that: "Said injuries and damages to him were proximately caused by the negligence of the defendant, W. J. Weaver, who was then and there in the employment of defendant, Louisville and Nashville Railroad Company, and was then and there engaged in the active performance of the duties of said employment in and about the operation of said train, *which negligence consisted in this, said Weaver after becoming aware of the peril of plaintiff being injured by said train negligently failed to use all of the means at his command to avoid said train injuring plaintiff, when by the use of said means said train would have been prevented from injuring plaintiff*." (Italics supplied.)

Count B adopts the averments of count A as to the matters of inducement, and the injuries received by plaintiff, and avers that: "Said injuries were proximately caused by the negligence of the defendant, W. J. Weaver, who was then and there in the employment of the defendant, Louisville and Nashville Railroad Company, and was then and there engaged in the active performance of the duties of said employment in and about the operation of said train, which negligence consisted in this, *said Weaver negligently caused the collision of said train and said automobile*." (Italics supplied.)

The pleas were the general issue and contributory negligence. The court gave the affirmative charge for the defendants as to count B, and submitted the case to the jury under count A, resulting in a verdict in favor of the defendants.

Some of the special pleas, notably 3 and 7, were defective as pleas of subsequent contributory negligence, in failing to aver that plaintiff, after becoming aware of his peril, negligently caused or allowed his car to go upon the track on which said train was approaching and thereby proximately contributed to his injury. Louisville & N. R. Co. v. Scott, 222 Ala. 323, 132 So. 29. The court therefore erred in overruling the plaintiff's demurrers to said pleas as stating a defense to count A. However, this error was rendered innocuous by special instructions given at plaintiff's instance, which we have numbered for convenient reference as 14, 22, 27, 28, and 29, in which the jury was instructed that negligence on the part of plaintiff to defeat a recovery for subsequent negligence—the negligence charged in count A—must have occurred after plaintiff became aware of his peril. Southern R. Co. v. Dickson, 211 Ala. 481, 100 So. 665.

The appellant's next contention is that the

court erred in giving the affirmative charge, requested in writing by the defendant, as to count B.

The evidence is without dispute that the plaintiff was injured as the result of a collision between his automobile and defendant's passenger train, at Parkwood crossing. The plaintiff at the time was driving a Hudson automobile east along the public road which intersects and crosses the defendant's tracks, consisting of a double-track main line and two side tracks, one of the side tracks located east of the main line and the other on the west; the space in which the four tracks were laid, from the ditch on the east to the ditch on the west, being approximately 50 feet, with an embankment rising immediately from the ditch on the east side of the right of way and extending south. The evidence as to the height of this embankment is in dispute; the evidence of the plaintiff tending to show that this embankment was, at the time of the injury, approximately 10 feet in height, while the evidence offered by the defendant tends to show that the embankment was from three to six feet in height. The railroad at this point runs through a wooded section, the timbers extending up to the top of the embankment.

The time of the collision was about 2 o'clock in the afternoon of December 23, 1926. The train consisted of a locomotive, in charge of the defendant Weaver, and three passenger coaches, running as second No. 2, going from Montgomery to Birmingham, late of schedule time, and was proceeding north at from 45 to 50 miles per hour.

The plaintiff testified: "At the time of the collision I was going west. I was going toward Bessemer. I stopped, looked and listened for the train before I went on that crossing. There were four tracks at that time at the place I was hurt. I stopped about fifteen or twenty feet of the side track. I looked in both directions, I did not see any train. I did not hear any train, my hearing was good at that time. After I stopped, looked and listened and did not see any train and did not hear any train I started on in that direction onto the track. I crossed the first track, I crossed the space between the two tracks. I got up on the main line just before I saw the train. I had not heard any train before that time. * * * I did not know anything else after that." And on cross-examination:

"This car I was driving at the time of the accident was a Hudson Speedster, a five passenger car. The curtains were up, and the windshield was so I could see.

"Q. They were in that condition when you went against the train? Ans. Yes, sir. I was driving the car. I was going about fifteen or twenty miles an hour I guess at a point two hundred feet east of the accident.

Making about fifteen or twenty miles, I did not notice the speedometer. I was not going over to Bessemer to an entertainment, I was going after my money and coming back to an entertainment. Perkins was in the car the last thing I remember. * * * I do not remember Perkins leaving me. I do not remember him leaving the car at all. I told him just as I saw the train, I said jump, said something like that, I don't remember just what it was now. * * * The road I came on curved around from the south toward the west instead of coming from the north. That is a chert road. My hearing was good at the time I was driving along there before this accident. I said something to Perkins about jumping. At the time I spoke to Perkins we were right here, I got to that track, the front wheel was going right along here (indicating) when I noticed the train * * * coming and told him to jump. The train was about fifteen or twenty feet south of the crossing at the time I told him to jump. At that time my front wheels were on the main line, I told Perkins to jump, I don't know whether I kept looking at the train or not. At that time I was right here. At that time my eye sight was good. I did not wear glasses at that time, my hearing was good at that time; my hearing is good now. * * * I stopped even with the sign board, stopped fifteen or twenty feet east of the side track.

"Q. Was there anything to keep you from running to here (indicating), before you got on the side track and stopped? Ans. Yes, sir, that space along there is practically level back to the mail boxes for fifteen or twenty feet.

"Q. You did not drive down to there (indicating)? Ans. No, sir, I drove in fifteen or twenty feet of the side track, there was a big sign board on this side (indicating). I stopped right at the end of that. I came down this road, this road is higher than the railroad here.

"Q. Now, this is a point fifteen feet east of that track, how many hundred feet could you see down this way (indicating)? Ans. I could not see. I could not see down the track at all. You could not see this way (indicating), unless you looked right down the road. I had been over that crossing several times. I had not been over that road many times before that, only three or four different times before that time. I don't know how far I could see down the main line at the time I stopped for the crossing.

"Q. What is your best judgment of the distance? Ans. I don't know, about thirty feet from the main line, that is my best judgment. I know where I stopped.

"Q. You say that was right about here (indicating)? Ans. Fifteen or twenty feet east of the east rail of the side track, and it might be the other track. It might be fif-

teen or twenty feet from the west side. I am just estimating that, it may have been fifteen or twenty feet from the east rail of the main track, I did not pay much attention, I am just guessing, that it was fifteen or twenty feet east of the east side track. I never noticed any mail boxes there. I did not shut off my engine. I stopped dead still, as quickly as I looked down and up and straight and saw no train I started on.

"Q. How far could you see toward the train? Ans. About fifteen or twenty feet you could see and when we moved up a little you could see fifty or seventy-five feet.

"Q. When you got on the side track, when you came on and got onto the side track, how far could you see down this way (indicating)? Ans. You could not see any further I said than about 150 or 175 feet, this is my judgment of it, but I don't know exactly. The reason you could not see the track bends around. At that time you could not see the whistle post from where I stopped, *but you can see it now*, they have dug the banks back from the side track.

"Q. Will you tell this jury and this court that you could not see that whistle post that day from there (indicating)? Ans. I never noticed it. It is not straight for about a quarter of a mile. It begins to turn in seventy-five or a hundred feet.

"Q. You testify that the tracks begin to turn in seventy-five or a hundred feet of that point (indicating)? Ans. Yes, sir, they begin to turn. I never have noticed how many cars could be put on that side track before it gets down there to that turn you are talking about. I never noticed if it is a quarter of a mile long. I have been over there since this accident, but I have never stopped and noticed that.

"Q. You never looked for that whistle post? Ans. I don't think it is a quarter that the switch track goes before it turns. I did not see how far the main line went before it turned. You could see where it curved.

"Q. You know that it is between a thousand and two thousand feet to that turn? (indicating). Ans. No, sir, it is about 175 feet, I am just guessing, it might be two hundred. It is not three hundred. It could not be three hundred. When I stopped and started forward again I started off in low gear. I was on the level ground, about fifteen or twenty feet of the side track.

"Q. That would be here inside the right of way (indicating)? Ans. I stopped in about fifteen or twenty feet of the switch track. I did not get over the ditch not when I stopped. I don't know that it is twenty-five from the east rail to that ditch there as you indicated. I would say it is about ten feet. I was on that level space. I never noticed how fast I went after I started off after I stopped and

looked for the train, but I was just barely moving along about *five or six miles an hour looking north*. I never changed speed from the time I started off until I was hit by that train. At that time I could stop my car in about three feet. The engine was about ten or fifteen feet south of the road I was traveling. From the time I started up, running about five or six miles an hour, I could not hear nor see the train until it got in about fifteen feet of me. I was barely moving along just before I stopped.

"Q. Fifteen or twenty miles an hour? Ans. No, sir, I was going four or five miles an hour.

"Q. Coming around this curve up here (indicating) about two hundred or three hundred feet east of the east rail of the side track how fast were you going then? Ans. That curve does not extend that far. It gradually comes up and curves up a little hill, up grade up here (indicating).

"Q. How far is it from the east rail of this side track here to a point on this road up here where you could see that crossing? Ans. Well, I could not say but it is about fifty feet.

"Q. Don't you know it is about two hundred or three hundred feet, don't you know that you can see two hundred or three hundred feet, or two hundred and fifty feet at least? Ans. No, sir. There is a house that sets there on the south side of the dirt road. It is up on the hill here (indicating). You can't see the road from that house, because there is a hill there.

"Q. I am talking about the opposite side of the house? Ans. No, sir, not for two hundred feet. You can not see a hundred and fifty feet back. I don't think you could see but about fifty feet, that is just my estimate. My brakes were good at the time of the accident, I tried them all along when I was meeting cars on the curves. Traveling twenty, fifteen or twenty miles an hour I can stop in six or eight feet. I had had experience in running and stopping cars. I could stop in ten feet running twenty-five miles an hour. Running thirty miles an hour I would stop in fifteen or twenty feet. Running thirty-five miles an hour I could stop in about twenty or twenty-five feet. Running forty miles an hour, you could stop in twenty-five or thirty feet.

"Q. If you were running at twenty miles an hour on that road, on that day, in that car with the brakes in that condition you say you could stop in six or eight feet? Ans. Yes, sir, I did not apply the brakes at all when I made that stop, *I did not attempt to run off the track when I saw the train, I did not have time. There was nothing to prevent me from driving up with my car to a point fifteen feet from the east rail of the main line.* I don't know how far you could see down that track at a point fifteen feet east of the main track.

"Q. Give your best judgment? Ans. A hundred and seventy-five or two hundred feet.

"Q. In fifteen feet of the east rail of the main line, no ten feet going west that day on that crossing, how far could you see the train? Ans. You could not see over a hundred and fifty or seventy-five feet. I did not try it up about ten feet from the east rail of the side track.

"Q. If you had driven up within five or ten feet of the track on which the train was traveling, how far could you have seen down that track? Ans. A hundred and fifty or seventy-five feet. After I stopped and looked and did not see a train coming, and when I went on the track, I kept looking north to see if anything was coming instead of looking the way the train was coming.

"Q. Then until you got your wheels about on that rail you never looked south any more (indicating)? Ans. No, sir, I kept looking north. Whenever I came on the track I was looking north. There were some box cars up north of the track. You could see as far north as you could south, up there to some box cars that were somewhere along there. I never paid any attention if there were any box cars south of the road. The train was coming from the south and struck me.

"Q. This railroad is practically level and four tracks wide here (indicating)? Ans. As well as I noticed, it is." (Italics supplied.)

J. V. Perkins testified, in rebuttal, that he was the Perkins that was in the automobile with the plaintiff on the occasion under investigation, and that: "On that occasion we drove down about twenty or thirty feet from the crossing and stopped and looked and listened. After that we started to cross the track, the front wheels were on it and I saw a train coming. I did not hear that train whistle blow or the bell ring before the collision. My hearing was good at that time." And on cross-examination:

"I am a brother-in-law of Mr. Johnson, I married his sister. While traveling along there with Mr. Johnson that day, I jumped out. I don't remember if I opened the door and got out, I think I did. My best judgment is I opened the door and got out some way. That automobile was in good running order, it was a Hudson Speedster. I don't know if people used that kind of car that wanted to out run officers. That car that I was riding in had good brakes on it. It was about six or seven miles from the crossing from where I got in the car. I guess I got in the car about one o'clock.

"Q. Do you know in your best judgment about what time it was? Ans. I guess it was about one thirty, or one fifteen, or one. I don't think it was two o'clock, it was about one, not far from that. We did not have any other tours before we got to the crossing. We were running at a moderate gait, I call twenty-five or thirty miles an hour a moderate gait. The car was going twenty-five or

thirty miles an hour a moderate gait. The car was going about four or five miles an hour when I jumped out. I fell, I don't know about rolling over. I don't remember getting dirt and mud all over me, I never did know that I had mud on me. I did not have gravel in my head and ears, I fell down.

"Q. You could have gotten out of the car without falling down, you were sober? Ans. Yes, sir. A man will walk four or five miles an hour. I do not know whether I opened the door or not. I do not remember opening the door, it was already open.

"Q. You must have opened it? Ans. I must have.

"Q. Where were you when you started to open the door? Ans. *About fifteen feet from the main line.* I said something about a train. At that time we were going four or five miles an hour and fifteen feet from the main line. I knew we were going four or five miles an hour then. I never did drive a car, Johnson was driving. I don't know how long he had been driving. I had known him to be driving about five or six years, I suppose. I don't know how many times he had run across that crossing. I had ridden with him before, that was not the first time, this was just before Christmas. We were going toward Bessemer. I don't remember whether I hollowed after I opened the door or before. I could not say whether I had opened the door or not. I don't know whether I said to Johnson anything about the train before I started to leave him. I did not tell him Good-bye, *I said there is a train.*

"Q. And you opened the door and got out? Ans. Yes, sir. The train was already right on us when I said there is a train.

"Q. You said you were about fifteen feet east of the east main line track and you jumped out while you were running at four or five miles an hour, here is the side track and here are the mail boxes about fifteen feet from the side track? Ans. I don't remember the mail boxes. I jumped out somewhere about the side track. On the right side.

"Q. This is the crossing (indicating), may be I had better explain it to you: This is the highway here, and this was taken in the direction in which you were going, and this is west toward Bessemer, this is south toward Montgomery, and this is north toward Birmingham, do you understand this map, if you don't tell me, I don't want to confuse you (indicating)? These are the two lines that represent the side track, and these two represent the main line, and this is a side track, and this is east, now where did you hit the ground? Ans. I hit it right there on the side (indicating). This is the side track. *I hit the ground in the center of this side track,* as well as I remember. The engineer of that train when I started to open the door was back this way (indicating). On the first main

line back this way. It might have been back there about thirty feet something like that, I could not say for sure. It was about thirty feet from the crossing when I first saw the train.

"Q. How far did you go further toward the track after you saw the train before you started to open door? Ans. I didn't wait. It didn't take me but just a little while to get out of the car, my best judgment is four or five seconds. I don't know that it would take over two seconds to do it.

"Q. Would it take you over three seconds to get out of that car? Ans. I'll say it took me four or five, I don't know how long it would take. I don't remember Johnson saying anything to me when I told him there was a train. He was sitting right by me. I said: 'There is a train,' something like that." (Italics supplied.)

The plaintiff also offered a number of witnesses who testified that they were in a position to hear, and did not hear, the whistle of the train, or the bell, as it approached the crossing.

The defendants' evidence goes to show that the engineer blew the crossing signal, consisting of two long and two short blasts of the whistle; that this was done between the whistle post, which was from one thousand to fifteen hundred feet south of the crossing, and that the bell was ringing, and it continued to ring until after the train stopped north of the crossing; that the space of time covered by giving the crossing signal was about ten seconds; that the train was running ahead at the rate of forty-five miles per hour—67½ feet per second. That when the whistle ceased to blow the head of the locomotive was something like 700 feet south of the crossing; that the train was traveling upgrade and was making some noise; that the tracks were straight from the whistle post to the crossing, and that he was keeping a lookout ahead; that the engine and tender, one of the coaches, and about two-thirds of the second coach had passed over the crossing and plaintiff's automobile, which was approaching the crossing and up to the time of the collision, made contact with the water tank under the second coach; that there was no obstruction on the track when the locomotive reached and passed over the crossing; that when the automobile crashed into the train, the head of the locomotive was 200 feet or more north of the crossing, and was stopped within about 600 feet, after the collision.

Defendants' evidence as to the straightness of the tracks approaching the crossing and the point of collision between the automobile and the train is corroborated by the physical facts as illustrated in photographs of the passenger coach, and views of the crossing and the section of tracks immediately south of the crossing.

The defendant Weaver testified that he first discovered the approaching automobile when it was about 200 feet from the crossing; that it was then moving forward at the rate of 25 miles per hour, and that it continued at this rate without stopping until it crashed into the side of the train; that when he first discovered the automobile, the locomotive was about 125 feet from the crossing; that it would require at least two seconds to apply the brakes and from one to five seconds to grasp the whistle lever and blow the whistle.

In Atlantic Coast Line R. Co. v. Jones, 202 Ala. 222, 223, 80 So. 44, 45, it was observed: "'That it is the duty of a person approaching the track of a railway for the purpose of crossing it to stop, and to look, and to listen, if need be—that is, if the exercise of the sense of sight does not suffice to fully disclose the situation for approaching trains—and that the omission of this duty, followed by injury in collision with a train, locomotive, or car while attempting thus heedlessly to cross over the track, is as matter of law negligence on the part of the traveler so contributing to the result as to defeat his action, counting on the injury as having been produced by the simple negligence of the railway company or its employees, are propositions of such universal acceptance, of such frequent declaration by this court, and of such obvious soundness, that we shall neither discuss them nor cite authorities in support of them. It is equally clear on principle and authority that this duty must be performed at such time and place with reference to the particular situation in each case as will enable the traveler to accomplish the purpose the law has in view in its imposition upon him. He must stop so near to the track, and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked, and listened and his attempt to proceed across the track. If he stops so far from the railway as that a train which could not be seen from that point could and does reach the crossing by the time he has traversed the intervening distance and gotton on the track, he negligently contributes to the resulting collision and injury. And the same is true if, though he stop at the track, he lingers there after looking and listening, and delays crossing until a train not in sight or hearing when he stopped, looked, and listened has come meantime upon the scene and collides with him when he does attempt to cross.' Cent. of Ga. R. Co. v. Barnett, 151 Ala. 410, 44 So. 392." And in Louisville & N. R. Co. v. Calvert, as Adm'r, 172 Ala. 597, 601, 55 So. 812, 814, that: "This duty was not discharged by stopping once, some distance off, as the law re-

quires a continuing duty to see that the way is clear before attempting to cross, if he [the traveler on the highway] can stop, look, and listen, and thereby ascertain that the way is clear by doing so." Central of Georgia Railway Company v. Foshee, 125 Ala. 199, 212, 27 So. 1006; Central of Georgia Railway Company v. Barnett, 151 Ala. 407, 410, 411, 44 So. 392; Louisville & Nashville Railroad Co. v. Turner, 192 Ala. 392, 68 So. 277; Louisville & Nashville R. Co. v. Williams, 172 Ala. 560, 55 So. 218.

In Cunningham Hardware Co. v. Louisville & N. R. Co., 209 Ala. 327, 96 So. 358, there was evidence tending to show that the defendant's flagman at the crossing signaled the driver of the truck to proceed across the crossing after he had stopped, and that said driver, without notice or knowledge that the engine was approaching, proceeded, in response to the signal of the flagman. This evidence, as the court held, made the question of contributory negligence one for the jury.

In Birmingham Belt R. Co. v. Watkins (Ala. Sup.) 146 So. 279,[1] there was evidence tending to show that if the traveler had again stopped and looked and listened, he could not have discovered the approach of the train which was backing in the darkness of the night over the crossing without having a watchman on the rear, and without signals, with the engine pushing the train two or three blocks from the crossing.

In Miles v. Hines, Director General of Railroads, 205 Ala. 83, 87 So. 837, the only plea interposed was the general issue; hence the question of contributory negligence was not present.

■ Assuming that the testimony of the plaintiff and his witnesses is true, he stopped at a place where he could not see more than thirty feet south of the crossing, and did not hear the approaching train, yet he proceeded to cross, at a slow rate of speed, looking only to the north, and without making any further observation by sight to the south—the direction from which the train was approaching—until his automobile was just about to pass upon the main line track on which said train was approaching, and when it was within 20 to 30 feet of the crossing. Still, if he had made proper and timely observation by sight, to the south, he would have discovered the train in time to have again stopped his automobile before it entered the zone of danger from the on-coming train; and was therefore guilty of negligence proximately contributing to his injury.

■ On the other hand, if it be assumed that the defendant Weaver—whose negligence alone is counted on—failed to give the statutory signals, he was therefore guilty of initial simple negligence; and assuming further that plaintiff approached the intersection and reached it ahead of the train, that he approached at the rate of 25 miles per hour, and did not stop and look and listen, as defendant's testimony tends to show, he was guilty of negligence as a matter of law, which proximately contributed to his injury.

Our judgment, therefore, is that the court did not err in giving the affirmative charge requested in writing by the defendant as to the simple negligence count.

Appellees insist that they were entitled to the affirmative charge as to count A, declaring on subsequent negligence, and therefore in rulings adverse to appellant, if error intervened, such error would be without injury. Hilton v. Birmingham Railway, Light & Power Company, 192 Ala. 474, 68 So. 343.

■ The substance of appellees' argument here is that if it be assumed that the plaintiff's testimony showed the true situation confronting the parties—that plaintiff approached the crossing and stopped and looked and listened, 15 or 20 feet from the east rail of the side track on the east, and then proceeded at a slow rate of speed, 5 or 6 miles per hour, and that the engineer observed this conduct on the part of the plaintiff—the engineer had the right to assume that the plaintiff was aware of the train's approach and would not attempt to cross the track on which the train was approaching, and, therefore, no duty rested upon him to resort to preventive efforts to conserve plaintiff's safety, and if plaintiff's automobile proceeded until it passed upon the track 20 feet ahead of the rapidly approaching train, nothing could have been done to prevent the catastrophe.

There is no escape from the conclusion, as a matter of law and fact, in these circumstances, that it was humanly impossible for the engineer, Weaver, to do anything to prevent the collision after the automobile passed onto the tracks on which the train was approaching, and while he had the right, as a matter of law, to assume that the plaintiff would not go on the track, he could not indulge this assumption beyond the time plaintiff's danger became imminent. Hurt v. Southern R. Co., 205 Ala. 179, 87 So. 533; Birmingham Railway, Light & Power Co. v. Williams, 158 Ala. 381, 48 So. 93. In fact, until it became apparent to the engineer that plaintiff was unaware of the train's approach, and that the automobile would probably enter the zone of danger from the approaching train, it could not be said that he discovered plaintiff's peril. Central of Georgia Ry. Co. v. Bates, 225 Ala. 519, 144 So. 9, 10; Young v. Woodward Iron Co., 216 Ala. 330, 113 So. 223; Southern Railway Co. v. Drake, 166 Ala. 540, 51 So. 996; Daniels v. Carney, 148 Ala. 81, 42 So. 452, 7 L. R. A. (N. S.) 920, 121 Am. St. Rep. 34, 12 Ann. Cas.

---

[1] 226 Ala. 197.

612; Central of Georgia Railway Company v. Foshee, 125 Ala. 199, 27 So. 1006. If the engineer discovered such peril in time to give plaintiff warning by a blast of the whistle, and failed to do so, he would be guilty of subsequent negligence. Louisville & N. R. Co. v. Calvert, as Adm'r, supra; Western Ry. of Alabama v. De Bardeleben, 226 Ala. 101, 145 So. 431.

Viewing the evidence in its light most favorable to the plaintiff, the plaintiff's automobile could not have come within dangerous proximity to the crossing until the train was within one second of the crossing, and according to the undisputed evidence the whistle could not have been blown until the head of the train reached the crossing, and according to the plaintiff's own testimony his negligence continued up to the very moment his automobile went upon the track, and after it got on the track it was impossible for him to avoid the collision. He (plaintiff) testified:

"I never noticed how fast I went after I started off after I stopped and looked for the train, but I was just barely moving along about five or six miles an hour *looking north.* I never changed speed from the time I started off until I was hit by that train. * * * I did not attempt to run off the track when I saw the train, I did not have time. There was nothing to prevent me from driving up with my car to a point fifteen feet from the east rail of the main line. * * *

"Q. Then until you got your wheels about on that rail, you never looked south any more (indicating)? Ans. No, sir, I kept looking north. Whenever I came on the track I was looking north." (Italics supplied.)

In the recent case of Southern Railway Company v. J. A. Miller (Ala. Sup.) 147 So. 149, 151,[1] the following utterances from St. Louis S. W. R. Co. v. Simpson, 286 U. S. 346, 52 S. Ct. 520, 522, 76 L. Ed. 1152, were quoted with approval, and they are applicable here: "The negligence of the conductor in failing to give warning was not separated by any considerable interval from the consequences to be averted, nor is there any satisfactory proof that warning, if given, would have been effective to avert them. The transaction from start to finish must have been a matter of seconds only. * * * Calculations so nice are unavailing to prove anything except the unity of the whole transaction. The several acts of negligence were too closely welded together in time as well as in quality to be viewed as independent." And in the Miller Case, supra, it was further observed: "So here the duty of plaintiff to stop, look, and listen was a continuing one, which persisted to the moment of the collision, and under the circumstances shown may be said to correspond with the 'primary duty' referred to in Davis v. Sorrell, 213 Ala. 191, 104 So. 397."

The burden was on the plaintiff, under count A, to show that Weaver was guilty of negligence which proximately caused his injuries, and the evidence at best leaves the question to a matter of mere conjecture, and does not rise to the dignity of a scintilla.

Moreover, the plaintiff's negligence, under all phases of the evidence, continued up to the very instant of the collision.

Our judgment, therefore, is that the defendants were due the affirmative charge as to count A, and if errors intervened in any of the rulings, they were without injury.

Affirmed.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.

### On Rehearing.

BROWN, Justice.

While it is doubtful whether a verdict for plaintiff under the evidence in this case could be upheld, on motion for a new trial, we are at the conclusion, after further consideration, that there was at least a scintilla of evidence that presented a jury question under the subsequent negligence count, necessitating consideration of some of the other questions presented on this appeal.

In Mobile Light & R. Co. v. Logan, 213 Ala. 672, 106 So. 147, the issues embraced simple initial negligence, and also simple subsequent negligence, and it was for this reason that charge 4 in that case was properly refused.

In the light of the testimony that plaintiff warned Perkins of the approach of the train, and the testimony showing that Perkins, who was on the seat in the car by the side of plaintiff, left the car at a point between the rails of the east side track, and plaintiff's testimony that the automobile could be stopped in three feet, the question of subsequent contributory negligence was also for the jury.

On the other hand, if that phase of the testimony which goes to show that the locomotive and one passenger coach reached and passed over the crossing, and that plaintiff's automobile ran into the second coach, is true, then plaintiff was the author of his own hurt and should not recover. In these circumstances, no duty rested on Weaver to warn the plaintiff of the fact obvious to ordinary observation—the presence of the train on the crossing.

The facts presented in the case of Miles v. Hines, Director Gen. of Railroads, 205 Ala. 83, 87 So. 837, clearly differentiate that case from this. In that case, the railway consisted of a single track, and the train approached the crossing around a curve through a deep

---

[1] 226 Ala. 366.

112

cut where the engineer could not see the crossing until the train, as the evidence showed, was within from 150 to 600 feet of the crossing, and the view of the traveler was obstructed by an embankment from 12 to 15 feet high and a pile of cross-ties; one phase of the evidence tended to show that the top of the train was not visible to one standing near the crossing until it was within 150 to 300 feet, and the head of the train and the automobile reached the crossing at approximately the same instant. The evidence in that case tended to show that, if the speed of the train had been slackened when it entered on the curve, the automobile would have passed over the crossing safely ahead of the train. In the instant case, the defendants' evidence shows that the track was straight as it approached the crossing for from 100 to 1500 feet, and the crossing was visible to the engineer; that the tracks were in a clear space of approximately 50 feet, and there was nothing to obstruct the view of the traveler after he came into that space. If the testimony of defendant was true, the train was on the crossing, and the head of the train was 200 feet north thereof before the automobile came in collision with the train.

The court, in dealing with the issue of subsequent negligence in the oral charge, instructed the jury as follows:

"As to the matter of subsequent negligence count in this case, that is really the issue for you to decide as to whether or not defendant was guilty of subsequent negligence at the time his injury was sustained. (1) *Any negligence that occurred after the defendant, its employes, agents or servants realized or recognized that there was impending peril to the plaintiff in the case, and* (2) *such agent, servant, or employee failed to use the necessary due care and diligence so as to avoid such impending peril of either party, then that would be subsequent negligence.*

"Of course, the defendant's theory is this, and this is the law, that if the defendant's agents, employes or servants (3) *were only required to use such diligence as a reasonable prudent man would use* under the same conditions after discovery of impending peril to the plaintiff, and that such diligence was used. And the defendant, or employes, agents or servants of the road had a right to assume that the plaintiff coming toward the crossing would use the ordinary diligent care that an ordinary prudent man would use under like circumstances so as to avoid an injury. (4) *The law does not require that in operating a train that the locomotive must stop at crossings of this nature.* The law does provide that the plaintiff and other parties may use rights of ways or highways across rights of ways, but they must exercise due care and diligence in making such crossing, that they must assume there is danger, and that if they see no danger, then they may proceed across

the road, but it does not mean that the plaintiff or persons using crossings may go ahead at any time, (5) *they must use diligence and care so as to avoid injury while crossing there.* I think I have made that clear to you so that you may understand just what it is, just what is required in such cases." (Italics and numbers supplied.)

The plaintiff reserved exceptions to the several excerpts indicated by italics, numbered from 1 to 5.

Some portions of this charge, notably the excerpt numbered 3, are inconsistent with the law as repeatedly declared by this court, that the duty of the engineer, after discovering the plaintiff's peril, if he did discover it, before the head of the train reached and passed the crossing in time to do so, was to do all in his power, to use all appliances at hand promptly, known to prudent and skillful engineers, to prevent injury. Louisville & Nashville Railroad Company v. Young, 153 Ala. 232, 236, 45 So. 238, 16 L. R. A. (N. S.) 301; Southern R. Co. v. Alsobrook, 223 Ala. 540, 137 So. 437.

This error was not cured by written instructions subsequently given at the request of the plaintiff, which set up a different rule—and the correct one—in conflict with the oral charge of the court. Clinton Mining Co. v. Bradford, 192 Ala. 576, 69 So. 4.

Actual knowledge of peril is essential to liability under the last clear chance doctrine, and therefore excerpt numbered 1 asserts a sound proposition of law. Central of Georgia Ry. Co. v. Bates, 225 Ala. 519, 144 So. 9; H. P. Emmett, Adm'r v. Alabama Great Southern R. Co., 226 Ala. 310, 146 So. 811.

The fourth excerpt cannot be approved, though in view of the undisputed evidence showing that it was humanly impossible to stop the train after the automobile went upon the track, no injury resulted to the plaintiff. Beavers v. Southern R. Co., 212 Ala. 600, 103 So. 887; Bates v. Louisville & Nashville R. Co., 184 Ala. 655, 64 So. 298.

Some of the charges given at the request of the defendant may possess misleading tendencies, but reversible error was not committed in giving them.

Negligence was not charged in general terms, but by specific averments, and charge 31 merely conforms to the specific averments of the complaint.

The charges refused to the plaintiff were either covered by charges given, were argumentative or abstract, and were properly refused.

We have examined the several rulings on the admission and exclusion of evidence, and find nothing therein to warrant a reversal.

For the error pointed out, the application for rehearing is granted, the judgment of af-

firmance is set aside, and the judgment of the circuit court is reversed and the cause remanded.

Reversed and remanded.

ANDERSON, C. J., and THOMAS and KNIGHT, JJ., concur.