# Louisville & Nashville Railroad Company v. Moran.

## Damage for Death of Intestate on Track.

(Decided November 7, 1914.   66 South. 799.)

1. *Railroads; Persons on Track; Evidence.*—The evidence examined and held insufficient to show the manner in which intestate met his death, or defendant's negligence therein.

2. *Same; Contributory Negligence; Look and Listen.*—A traveler who attempts to cross a railroad track in such close proximity to an approaching train that he is struck, and does not stop, look and listen, is guilty of contributory negligence.

3. *Same; Trespassers.*—Where a trespasser is run down on a railroad track, the railroad is liable only in the event that those in charge of the train saw him in time to have prevented his injury.

4. *Same; Burden of Proof.*—The provisions of section 5476, Code 1907, merely raise a presumption, in the absence of proof as to the contributory negligence of the party struck, that such party was not guilty of negligence contributing to his injuries, hence, in such case, it cannot be presumed that the person struck was trespassing upon the railroad track.

5. *Same; Subsequent Negligence.*—In order to hold a railroad company liable for the death of one run down by its train on its tracks, on the theory that its servants were guilty of subsequent negligence, it must be shown that the position of peril of deceased, became known to the servants of the railroad company in time for them to have avoided the injury.

6. *Same.*—Where recovery is sought on the theory of subsequent negligence, or negligence after the discovery of peril, the burden is on plaintiff to show such negligence on the part of the railroad company notwithstanding the statute requiring the railroad company to show itself free from negligence; the complaint having admitted the negligence of the intestate.

7. *Same; Evidence.*—The evidence examined and held not sufficient to require a submission to the jury of the question of the railroad's negligence after discovering the position of peril of deceased.

8. *Same; Negligence.*—One who attempts to cross in front of a train intending to take the chances incident thereto, is guilty of contributory negligence barring recovery for death or injury therefrom.

9. *Evidence; Weight; Physical Facts.*—To say that a person of normal eyesight, and who was on foot, looked for but did not see a nearby locomotive approaching on a straight track, is contrary to all physical facts and is not to be regarded.

[Louisville & Nashville Railroad Company v. Moran.]

10. *Negligence; Action; Pleading.*—Contributory negligence is a special and affirmative defense which must be pleaded with particularity, and only those matters pleaded can be shown in the evidence.

APPEAL from Morgan Law and Equity Court.

Heard before Hon. THOMAS W. WERT.

Action by Nina L. Moran, as administratrix, etc., against the Louisville & Nashville Railroad Company. From a judgment for plaintiff, defendant appeals. Reversed and remanded.

The following is the map referred to in the opinion:

EYSTER & EYSTER, for appellant.

CALAHAN & HARRIS, for appellee.

DE GRAFFENRIED, J.—In reporting this case, the reporter will set out the map which is found on page 22 of the transcript.

1. W. J. Moran resided in New Decatur at a point west of the above depot. He left home, on the day of his death, at about 6:45 p. m., and went to a store in

New Decatur which lies east of the above depot. He could not have tarried long in New Decatur, because his dead body was found on the west side of the north main track of the Louisville & Nashville Railroad at or near the above depot at about 7:15 or 7:20 p. m. of the same day. In other words, he was dead in about one-half of an hour after he left home. When he left home he was on foot, and everything indicates that he remained on foot until his death. When he left home it was raining, but not heavily, and he left without a raincoat or an umbrella. While he was in New De-·catur he bought an umbrella. The wind was blowing from the south when Moran was in New Decatur and was blowing from that direction at the time of his death. The Louisville & Nashville Railroad Company has a double track at New Decatur. The main track on the east side is used by north-bound trains, and the one on the west side by south-bound trains. At 7:15 p. m. on that day the passenger accommodation arrived at New Decatur on time. It remained there about three minutes, when it proceeded north to its destination, the station at Decatur, which is a mile or two north of New Decatur. At New Decatur the track of the Louisville & Nashville Railroad, both north and south of the station, is straight for a long distance, and the track is level. In other words, there are no fills or cuts in the roadbed for a considerable distance both north and south of the station, and there are no curves in the track. The result is that a train which approaches the station at New Decatur either from the north or from the south can be seen by an ordinary observer, standing on or near the track at or near the station, for a considerable distance before it reaches the station.

2. In explanation of the map which the reporter has set out in his summary of the facts, we desire to say that Johnson and Grant streets, which run east and west, are the streets which are usually traveled by pedestrians going to and from New Decatur to the station at New Decatur, and that the path, shown on the map as running diagonally from the opera house on Johnson street by the edge of the north end of the station across the railroad into what is known as "Gordon Drive," in New Decatur, is a path which is much traveled by pedestrians. Sometimes pedestrians walk down Grant street, and then walk through the hall shown in the station house, and then take the path which leads from the door shown on the map across the railroad into "Gordon Drive." The body of the deceased was found north of the path which leads from the door across the railroad, but whether it was found south or north of the path leading from the opera house across the railroad to "Gordon Drive" may be said to be disputed. The jury could have found that it was near this pathway, or perhaps that it was north of the depot itself when found.

On the occasion to which we refer, the locomotive stopped with its pilot north of the north end of the station. The engine and tender were from 60 to 70 feet in length, and next to them was the baggage car, which was 50 or 60 feet long, and after the baggage car came two passenger coaches.

3. The following parts of the testimony which we copy from the bill of exceptions, give the facts on the side of the plaintiff. A witness, R. E. Chandler, testified for the plaintiff substantially as follows: "I knew W. J. Moran, and had known him five or six years. I saw him the night of his death. He was at my store. He bought an umbrella from me. This about 15 or 20

minutes after 7 o'clock. It was a rainy night. The wind was blowing. My store is at the corner of Second avenue and Moulton street. The Masonic Theatre was located at that time on Johnson street, one-half block from Second avenue, on the west side of Second avenue, on the street that leads toward the New Decatur depot. After Mr. Moran bought the umbrella, he walked up Second avenue towards Johnson street. I was familiar with the New Decatur depot and its surroundings at that time. There is a path leading along Johnson street towards the depot, which is traveled considerably. This path intersects and crossed the railroad at the north end of the depot. There was another path there, which led across the tracks from Gordon Drive. The path at the north end of the depot was traveled frequently by people going to and coming from West Decatur. The population of West Town was about 2,000."

A witness, Houk, testified as follows: "I saw him the night he was killed. He was passing the Masonic Opera House. I was inside the hall when he passed. He was going west towards the New Decatur depot, and that was towards his home also. It was a bad night, raining, and some wind. He had an umbrella over him. It was after supper when I saw him. It was dark."

A witness, Kline, testified substantially as follows: "On the night W. J. Moran was killed, I was at the New Decatur depot. Was carrying papers at that time. I met the accommodation train that night. I was at the depot when the accommodation train came in—waiting for it. When I heard the train coming in, I went out to meet it. I went northwest from the door, about where the baggage car usually stands, and from there looked west.. The train was coming from the south. I don't remember what direction I was looking

[Louisville & Nashville Railroad Company v. Moran.]

when the train was coming up. I went out when I heard it blow. Was up there before it came in, and stood there and waited for it. I didn't remember what direction I was looking. When the train came up, I waited for the baggageman to throw my papers off. The engine and part of the baggage car passed me. When I got my papers, I took them over to the depot. I did not see Mr. Moran at any time. I saw nobody on the north. When the accommodation train pullled out, I was standing over by the door, and Mr. Hubbard said he thought there was a hat box or he saw a man on the track. The man (or the hat box, as Mr. Hubbard first thought it was) was about halfway between the north end of the depot and the crossing. The dead man, Moran, was found about 20 feet south of the north end of the depot. Part of his body was lying on the track. His head was lying northwest and his feet southeast. The middle of his body was across the west rail and on the outside of the rail, and his feet and legs on the inside of the rail. I didn't see this man there before the train came in. It seemed like he took a breath after I got to him. Mr. Hubbard was the first to get to him. Mr. Hubbard went there before I did. The body had not been moved. * * * I saw the accommodation train come in that night. I first saw it about where the street car crossing is—south of the depot. It was slackening its speed. I don't know whether the bell was ringing or not. Seemed like the whistle blew below the crossing, and also at the end of the coal chute. I don't know whether the headlight was burning or not. The electric light was burning at the depot, and the electric light at the street car crossing. Moulton street is 300 or 400 yards north of the depot, and street car crossing 300 or 400 yards south of the depot. I walked out from the depot to the tracks about the place where

8—190

the body of Moran was picked up on the tracks after the train pulled out. It was just about opposite where the body was found after the train pulled out. I was on the east side of the north-bound main. The north-bound main is the eastermost track, and I was standing about where the body was lying afterwards, and I was on the east side of north-bound main, somewhere near there. I didn't see anybody get on the track. I was right at the track, standing right there. There was no obstruction between me and the track except the trucks, and the ground was level. The trucks were about where I was. There was no person on the track. I didn't see anybody. I had a full view of the whole track, and didn't see anybody there. I stayed there until the engine passed me, and I followed the baggage car until it stopped. I walked alongside of the baggage door, until the train stopped. I stood there by the track until the engine and tender got past me, and then followed the baggage car until it stopped, and I didn't see any one. As the engine came up in full view of me, I didn't see any one on the south. I could see all around there. I didn't see any one on the track. I saw the engine approaching and heard the whistle. I didn't see any one on the track and I had a full view of the engine. I didn't see anybody north of it on the track. I had a full view of the engine. I didn't see anybody north of it. I had a view north and south on the track and didn't see the engine run over any one. * * * I was looking for the train when it pulled in, looking down towards the train. At the time the train was coming in, I didn't pay any attention to what was going on north of me. Seemed like the baggage car stopped about where the body was afterwards found. I don't remember definitely how it was situated. That is the

[Louisville & Nashville Railroad Company v. Moran.]

way I recollect it. My recollection is that the engine stopped eight or ten feet north of the depot."

A witness, Hodges, testified for the plaintiff as follows: "I remember the night Moran is said to have been found at the New Decatur depot. I wasn't there. I passed there the next morning about 8 or 9 o'clock. I didn't examine the track on the main line where he is said to have been found, but noticed, in passing over there, blood on the track—or something. I don't know whether it was blood or not. I saw some signs of the ground being raked about six feet along the track. This blood was on the ties. This was in New Decatur, on the Louisville & Nashville Railroad Company's tracks. This blood and dragging was a little north of the north end of the depot. I couldn't see just how far. I noticed the path that came down by the north end of the depot from the opera house. This path crosses the tracks of the railroad company. There are two paths there, and this blood and dragging was between the two paths. The night Moran was killed was a very windy and rainy night. * * * I saw this blood on the north-bound main, on the west rail. This was something like 15 or 20 feet north of the north end of the depot. Some of the ties were covered with cinders and some were not. I didn't see any blood on the rail; couldn't see the rail. I was on the engine and couldn't see the rail from where I was. I was in the fireman's side of the engine, going north. I was looking out of the cab window and couldn't see the rail. The disturbance of the ground was along the side of the rail, about two feet from the rail, on the outside of the west rail, and the disturbance looked like something had been drug along there. The disturbance was about six feet long. The width of the disturbance of the ground was about two feet—just the top of the

ground brushed off—wasn't half an inch deep. We were going by there slowly on a swtich engine. The cab of the engine on which I was riding extended about even with the tie. I was hanging out of the window, and couldn't see how many ties were exposed. It may have been that the cinders were up even with the top of the rail. I don't think all of the ties were covered. I think some were covered and some were not. I couldn't say I saw a splotch of blood—something looked like blood. I don't mean to tell the jury after that hard rain on that night the next day I could see blood—something looked like blood—some red splotches which may have been red dirt. The balance of the ground was covered with cinder and was black. I saw two or three of the ties that had something on them. I think there was a path north of the north end of the depot. The depot has been moved two or three times. That path in there between the rails was made of red sand. There was no crossing there for vehicles. The disturbance where I saw it was south of the north path. That is where I saw the signs. I couldn't say where he was killed. I didn't see it. I guess those paths were about 60 feet apart."

The above-quoted testimony gives substantially the case for the plaintiff.

4. We take it that the evidence indisputably shows that on the named occasion the headlight of the locomotive was in proper condition and performing its appropriate functions; that the train came in without steam and at a low rate of speed. The engineer testified that he was at his accustomed place, was keeping a proper lookout and that he saw no one on the track. He further testified that all of the usual and appropriate signals by bell and whistle were given, and that he knew nothing of the tragedy until he reached the sta-

tion at Decatur. The evidence shows nothing unusual about the behavior of the train or of any member of its crew while the train was approaching or was at the New Decatur station. The train stopped at its accustomed place, the passengers, baggage, and mail were discharged in the usual manner, and the train remained at the point two or three minutes (its accustomed time at that point), and then proceeded on its journey. The circumstances surrounding the tragedy, the behavior of the bystanders and of the crew of the train itself, coupled with every fact testified to by each person who was at or near the station, clearly and conclusively establish the fact that no one at that station or upon that train knew or thought that a human life had been destroyed, until the mangled body of the deceased was found upon the track after the departure of the train.

(1) Out of the facts—the uncontroverted facts—of this case, one truth appears, and that is that the manner of the death of Mr. Moran is a mystery which, under the facts of this record, no finite mind can solve. Every solution offered is a mere speculation. He was probably killed by the train, but how, we do not know. The only theory which possessed the dignity of a probability is that presented by a part of the testimony of the engineer, viz., that as he was leaving the station he saw a man on the west side of track with an umbrella over him, walking diagonally in the direction of the train as if he intended to attempt to board the train. If, after Mr. Moran crossed the track, he concluded to go into Decatur to do something to which he forgot to attend while he was in New Decatur, and for that purpose concluded to catch the train, and in attempting to board the train missed his hold and was thrown under the train, we have some reasonable ex-

planation of the blood spots on the rear trucks of the train, and which do not appear to have appeared upon the forward trucks, and also a possible reasonable explanation of the manner of his death. It is claimed that the engineer, on this point, is contradicted, and that this should not be believed. We do not say that this testimony should have been believed, but we do say that this is the only rational theory (consistent with the proposition that Mr. Moran was, on the particular occasion, in the possession of his normal faculties, and that he conducted himself in the manner presumed by the law) which appears from any fact shown in this testimony, upon which his death can be accounted for. If Mr. Moran was killed by the train as it came into New Decatur, and while he was walking across the track, he saw the train and took his chances, or he failed to stop, look, and listen as the law required him to do.

(2-4) No human pedestrian, in possesion of even less than normal eyesight, could, by any possibility, before walking on the track have "stopped, looked, and listened" for that train without seeing it and being conscious of its near approach. To say that a human being with normal eyesight, who is on foot, and who, before putting a foot upon a track, looked for a locomotive upon that track—a locomotive with a headlight, upon a straight track, and then in close proximity—and did not see that locomotive, is to stultify every logical faculty and the entire experience of mankind. To say that the deceased, without stopping, looking, and listening, walked upon the track immediately in front of the locomotive and so close to it as to be killed by it before he could walk across it is to convict him of contributory negligence. To say, as is argued by appellee, that he had stopped upon the track or in dangerous proximity

to it, and that, with his umbrella between him and the locomotive, he stood there until he was knocked off by the locomotive, is to presume a fact not deducible from the testimony, and makes him a trespasser, and renders the defendant liable only in the event the engineer or fireman saw him in time to prevent the injury. The evidence fails to show that the engineer or fireman saw the deceased upon the track; and it also fails to show that he ever, for one moment, stopped on the track. To say that he stopped on the track, or that his foot got hung on the track, or that he fell accidentally on the track, would be to indulge in the wildest speculation.

(5) 5. Section 5476 of the Code of 1907 provides that: "When any person or stock is killed or injured * * * by the locomotive or cars of any railroad, the burden of proof, in any suit brought therefor, is on the railroad company to show * * * that there was no negligence on the part of the company or its agents."

This section was construed in *Ex parte Southern Railway Company*, 181 Ala. 486, 61 South. 881. Under the rules laid down in that case and in the cases of *Alabama Great Southern Railroad Co. v. McWhorter*, 156 Ala. 269, 47 South. 84, and *Louisville & Nashville Railroad Co. v. Calvert*, 172 Ala. 325, 55 South. 814, in which the doctrine of subsequent negligence is discussed, no act of subsequent negligence is shown by this evidence to have been committed by the engineer. In *McWhorter's Case* the evidence showed that the injured party was sitting on the end of a cross-tie in dangerous proximity to the track. The engineer testified that he did not see him, but the jury had a right to infer that the engineer, if he was on the lookout (as he testified) did see him, and this because the evidence showed that the injured party was sitting on the cross-tie for such

a period before his injury as that, if the engineer was on the lookout (as he testified), he must have seen him. In the case of *Louisville & Nashville Railroad Co. v. Calvert, supra,* the evidence showed where the mule, buggy, and man were, and what they were doing (not where they might have been and what they possibly might have been doing) when they came within the range of the engineer's vision; and the court, in that case, having a fact (not a speculation or possibility) upon which to predicate the doctrine of "the last clear chance," was able, as the facts justified its application, to apply the doctrine. The presumption which the law indulges in favor of plaintiffs in actions of this sort, when the proof is silent as to the contributory negligence of the plaintiff, that the plaintiff's negligence did not contribute to his injury, is confined to the doctrine of contributory negligence. This presumption (when the evidence is silent on the particular subject) is a presumption against negligence or want of prudence on the part of the plaintiff. —*Ledbetter v. St. Louis & S. F. Ry. Co.,* 184 Ala. 457, 63 South. 987. The doctrine laid down in *Ledbetter v. St. Louis & S. F. Ry. Co., supra,* which merely declares that, where there is no evidence of contributory negligence on the part of the plaintiff, none will be presumed, precludes us, in the absence of all evidence as to what the plaintiff's intestate was doing at the time he was injured, from presuming, as a help to his count for subsequent negligence, that at the time he was killed, he was loitering upon the track, and was therefore, at the time he was killed, a trespasser.

(6-8) 6. The argument is advanced that, from the fact that the injuries to the body of the deceased indicate that he was struck on the left side, we are authorized to presume that the deceased was standing on

[Louisville & Nashville Railroad Company v. Moran.]

the track when he was struck. This argument is untenable. If the plaintiff was walking across the track when he was struck, then as he was traveling to the west, and the train was traveling to the north, the left side of his body would have been the point of contact. If we must indulge in presumptions, then, under the rules laid down in *Ledbetter v. St. Louis & S. F. Ry.*, supra; *Ex parte Southern Railway Co.*, supra; *L. & N. R. R. Co. v. Calvert*, supra; *A. G. S. R. R. Co. v. McWhorter*, supra; *Southern Railway Co. v. Bush*, 122 Ala. 470, 26 South. 168; *Southern Railway Co. v. Shelton's Adm'r*, 136 Ala. 191, 34 South. 194; *Anniston Electric & Gas Co. v. Rosen*, 159 Ala. 195, 48 South. 798, 133 Am. St. Rep. 32; *Johnson v. B. R. L. & P. Co.*, 149 Ala. 529, 43 South. 33; and *Cardwell v. Louisville & Nashville Railroad Co.*, 185 Ala. 628, 64 South. 564—we must presume that the deceased, at the time he was killed, was not standing or stopping on the track; that he was not a trespasser; but that he was walking across it.

In the application of legal principles to the doctrine of subsequent negligence, our courts have never at any time lost sight of the truth declared in *Cardwell v. Louisville & Nashville Railroad Co.*, supra, that, when such a right of recovery is claimed, the plaintiff must prove by evidence the basic fact of his case, viz., that at the time of his injury, he was so circumstanced to the knowledge of the defendant as that the defendant, after the discovery of his perilous situation, could, by the exercise of due diligence, have prevented the in-. jury. If, when subsequent negligence is relied upon, the evidence shows the situation of the plaintiff, then the accompanying facts and circumstances may sometimes authorize a jury to infer knowledge by the defendant in time to prevent the injury. Subsequent neg-

ligence is negligence only because of a knowledge, on the part of him who commits injury, of the situation of the party injured, in time, by the exercise of due diligence, to prevent the injury; and in all such cases the burden is on him who, by his complaint, admits his own want of care, to show a want of care on him who commits the injury.—*Bason v. A. G. S. R. R. Co.,* 179 Ala. 299, 60 South. 922.

Undoubtedly, under all the evidence and all the reasonable deductions which could be drawn from the evidence, the defendant was entitled to affirmative instructions as to count 4, in which the plaintiff relies upon the subsequent negligence of the defendant.

7. In the case of *Peters v. Southern Railway Co.,* 135 Ala. 533, 33 South. 332, this court, speaking through Dowdell, C. J., said:

'In the face of these undisputed facts as to speed and distances, can it be said that the mere statement of the plaintiff in evidence, however conscientiously made, that he stopped, looked, and listened before entering upon the track, that he neither saw nor heard a train approaching, that as soon as he saw it coming he turned back, and did all he possibly could to save himself, raises up a material conflict in the evidence as to his failure, in the exercise of due care and prudence, in his effort to cross? We think not. To have stopped, loitered, or lingered upon the track in crossing it, or to have walked with indifferent leisure in crossing, would have been a want of due care, and consequently negligence. When facts are admitted which conclusively establish another fact, the mere denial by a witness of the existence of the fact so established does not and should not create that material conflict in evidence which would require a submission of the issue to the jury. In the case of *Artz v. Railroad Co.,* 34 Iowa

154, 159, in discussing the question before us, it was there said: 'But it is urged by the appellee's counsel that plaintiff testifies that he did both look and listen to see and hear the train, but did not; and that this testimony shows that he was not guilty of contributory negligence, or that, at the very least, it made that a question of fact for the jury. The difficulty, however, with the position is that, the conceded or undisputed facts being true, this testimony cannot, in the very nature of things, be also true. It constitutes, therefore, no conflict. Suppose the fact is conceded that the sun was shining bright and clear at a specified time, and a witness, having good eyes, should testify that at the time he looked and did not see it shine. Could this testimony be true? The witness may have been told that it was necessary to prove in the case that he did look and did not see the sun shine; he may have thought of it with a desire that it should have been so; he may have made himself first believe it was so; and this belief may have ripened into a conviction of its verity, and, possibly, he even may testify to it in the self-consciousness of integrity. But, after all, in the very nature of things, it cannot be true, and hence cannot, in the law, form any basis for a conflict upon which to rest a verdict. A man may possibly think he sees an object, which has no existence in fact, but which it may be difficult, if not impossible, to prove did not exist or was not seen. But, an object and power of sight being conceded, the one may not negative the other.' The following cases are to the same effect: *Maryland v. Railroad Co.* [123 Pa. 487] 16 Atl. 623 [624, 10 Am. St. Rep. 541]; *Myers v. Railroad Co.* [150 Pa. 386] 24 Atl. 747; *Payne v. Chicago, etc., R. Co.,* 136 Mo. 562, 38 S. W. 308; *Chicago, etc., R. Co. v. Pounds,* 82 Fed. 217 [27 C. C. A. 112]. While the precise question before

us has not been decided by this court, the principle involved has been tacitly recognized and applied in a number of cases, among which are the recent cases of *H. A. & B. R. Co. v. Fennell*, 111 Ala. 356 [21 South. 324], and *Central of Georgia Railway Co. v. Foshee*, 125 Ala. 199 [27 South. 1006]."

(9, 10) In the instant case we have no statement of an eyewitness as to whether or not the plaintiff's intestate (if he was killed while on the track) stopped, looked, and listened before he went upon the track. Under the undisputed evidence in this case, if the deceased was killed by the train as it came into New Decatur, and if he complied with the requirements of the law and did stop, look, and listen for the approaching train, he saw that train and proceeded in disregard of apparent danger. If he failed to stop, look, and listen, then he violated a positive injunction of the law. In either event, he was guilty of contributory negligence. It does not follow, however, that, if it be conceded that the evidence in this case shows a state of facts requiring the defendant to prove contributory negligence of the deceased, the defendant, under the present condition of the pleadings, would be entitled to affirmative instructions in its behalf on the general subject of contributory negligence. Under the evidence in this case, the deceased was (if he was killed while crossing the defendant's track in front of a moving train) guilty of contributory negligence either in going on the track with a full knowledge of the situation and thus taking his chances. No person can, under the evidence in this record, tell whether the deceased, if he was killed by the train as it came into New Decatur, stopped, looked, and listened, and then proceeded in disregard of an obvious danger, or whether he negligently proceeded across the track without stopping, looking, and

listening. The evidence shows that if he was killed while on the track, as above stated, he was guilty of one or the other of these acts of negligence, but of which specific act the evidence fails to disclose. We have as much right to presume the one as the other. This being true (as defendant's plea of contributory negligence confines it to the leave "to give in evidence any negligence of plaintiff in failing to stop, look, and listen, or undertaking to crawl under or pass between the train"), the defendant was, on this phase of the case, so far as its plea of contributory negligence is concerned, in the same condition as was the defendant in *Southern Railway Co. v. Shelton, Adm'r,* 136 Ala. 209, 34 South. 194, in which case this court, through McClellan, C. J., said: "Contributory negligence is a special and affirmative defense. To be availed of it must be pleaded with particularity. And no other acts of negligence than those thus specially pleaded can be proved, and, if proved, they cannot be made the predicate for a verdict for the defendant.—*Ala. Mid. Ry. Co. v. Johnson,* 123 Ala. 197 [26 South. 160]; *Birmingham Ry. & Elec. Co. v. City Stable Co.,* 119 Ala. 615 [24 South. 558, 72 Am. St. Rep. 955]. As the presumption relied upon to support defendant's second plea did not necessarily and affirmatively sustain it, but in equal degree went to support another state of facts constituting contributory negligence, which was not pleaded, instead of the state of facts which was pleaded, it cannot be said that the court should have given the affirmative charge for defendant against the counts for negligence on its part."

8. While it may be that, under all the evidence contained in this record, the defendant was entitled to the general charge in its favor, without regard to the condition of the evidence and the pleadings with reference

to contributory negligence (*Liverett. v. Nashville, Chattanooga & St. Louis Railway*, 186 Ala. 111, 65 South. 54; *Southern Railway Co. v. Stewart*, 179 Ala. 304, 60 South. 927), we deem it unnecessary to engage in a discussion of that subject. Our views above expressed, we think, sufficiently indicate the law as it should be applied to the facts upon the next trial, if one is had.

Reversed and remanded.

McCLELLAN, SAYRE, and GARDNER, JJ., concur.