16 So.2d 167

**LOUISVILLE & N. R. CO. et al. v. BAILEY.**

6 Div. 103.

Supreme Court of Alabama.

Oct. 7, 1943.

Rehearing Denied Dec. 2, 1943.

Further Rehearing Denied Jan. 13, 1944.

Chas. H. Eyster, of Decatur, and White E. Gibson, of Birmingham, for appellants.

Taylor, Higgins & Windham and J. Howard Perdue, Jr., all of Birmingham, for appellee.

THOMAS, Justice.

The suit was under the homicide statute. Code 1940, Tit. 7, § 119.

The facts are stated in short that on November 18, 1941, Devoda Bailey, the eighteen year old son of plaintiff, was killed at Springdale Road Crossing in Jefferson County, Alabama, by north bound L. & N. passenger train No. 2 of which R. S. Adams was engineer. The railroad runs north and south and Springdale Road, a hard surface road, crosses it from east to west at right angles, about a mile and a half south of New Castle, and a mile and a half north of Black Creek.

One hundred sixty-five feet west of the railroad is a public road known as the Lewisburg-New Castle Road. The railroad is double track and straight for 276 feet south of the crossing and 450 feet north of the crossing. The train was proceeding in a northerly direction over the easternmost track and intestate came from the east and was driving a truck. The front wheels of the truck were barely

over the east rail when the collision occurred. Intestate was killed.

December 29, 1941, plaintiff, father of Devoda Bailey, filed suit in the circuit court against the Louisville & Nashville Railroad Company and R. S. Adams, its engineer. The complaint is stated in three counts. Defendant demurred to the several counts and plaintiff amended each. Demurrers of defendants to the amended complaint were overruled. Thereupon each defendant separately and severally pleaded the general issue, in short by consent, with leave to give in evidence any matter which would constitute a good defense if specially pleaded. Plaintiff withdrew counts one and three, standing on amended count two. June 4, 1942, the cause was tried before a jury, resulting in a verdict and judgment in favor of the plaintiff, and a motion for new trial was duly overruled, exception being reserved.

Amended count two, based on negligence, alleges in substance that on the 18th of November, 1941, defendants were engaged in operating a railroad train at Springdale crossing where the railroad tracks are on grade with the public highway at a point approximately two miles north of Lewisburg, and that plaintiff's minor son, Devoda Bailey, was driving an automobile truck on Springdale Road, and defendants ran the train against the automobile which Devoda Bailey was driving, and as a proximate consequence thereof Bailey sustained injuries from which he died on that date. "The death of said minor son *were* [was] caused as a proximate result of the negligence of the defendants in and about the operation of said railroad train at said time and place."

There was conflict in the evidence as to giving the statutory signals for railroad crossings. Pertinent provisions of said statute are: "The engineer or other person having control of the running of a locomotive on any railroad, must blow the whistle or ring the bell at least one-fourth of a mile before reaching any public road crossing, or any regular station or stopping place on such railroad, and continue to blow the whistle or ring the bell at short intervals, until it has passed such crossing, or reached such station or stopping place. * * * and also immediately before entering any curve crossed by a public road, where he cannot see at least one-fourth of a mile ahead, and must approach and pass such crossing at such speed as to prevent accident in the event of an obstruction at the crossing. * * *" Code 1940, Tit. 48, § 170.

The diagram of the crossing and immediate approach thereto reproduced in evidence shows a sharp curve in the railroad about 276 feet in the direction in which the train approached and thence straight to the crossing in question. Nothing obstructed the view from the engineer's outlook as he approached the crossing where the collision occurred.

Appellants insist that the general affirmative charge should have been given and that the evidence is not sufficient to sustain the verdict and judgment rendered thereon for the plaintiff.

Well established principles of law touching this case may be stated as follows:

■ Railroad track itself is a warning of danger. Louisville & N. R. R. Co. v. Williams, 172 Ala. 560, 579, 55 So. 218; Weatherly v. N., C. & St. L. R. R. Co., 166 Ala. 575, 51 So. 959.

■ If a traveler saw the approach of a train in time to avoid accident, he cannot predicate recovery on failure to give signals. Alabama Power Co. v. Bradley, 18 Ala.App. 533, 93 So. 73; Central of Georgia R. Co. v. Graham, 218 Ala. 624, 626, 119 So. 654; Sloss-Sheffield Steel & Iron Co. v. Pienhardt, 240 Ala. 207, 199 So. 33.

There is a duty to stop, look and listen:

■ (a) It is the duty of a person intending to cross a railroad track to stop, look and listen for approaching trains. Southern Railway Company v. Randle, 221 Ala. 435, 128 So. 894.

■ (b) Where must one stop? At such place as by the use of his senses highly important information will be afforded as to whether or not a train is approaching, so as to preclude the injection of an element of danger from a train if one is approaching. Louisville & N. R. R. Co. v. Turner, 192 Ala. 392, 68 So. 277. One about to cross a railroad track must stop so near the track and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked and listened and his attempt to proceed across the track. Southern Railway Co. v. Miller, 226 Ala. 366, 147 So. 149.

(c) If he stops where he can't see, he is negligent. If he stops so far from the railroad as that a train which could not be seen from that point could and does reach the crossing by the time he traversed the intervening space and has gotten on the track, he negligently contributes to the resulting injury. Central of Georgia R. R. Co. v. Foshee, 125 Ala. 199, 27 So. 1006; Louisville & N. R. R. Co. v. Calvert, 172 Ala. 597, 55 So. 812.

The defendants-appellants well select the following authorities to the effect indicated, and urge the same as material insistences:

"Where one attempts to cross railroad track known to him, without stopping, looking and listening, one is guilty of negligence per se. Glass v. M. & C. Ry. Co., 94 Ala. 581, 10 So. 215; Rothrock v. A. G. S. Ry. Co., 201 Ala. 308, 78 So. 84. Where obstructions interfere with view of track, it is all the more one's duty to stop, look and listen. Hines v. Cooper, 204 Ala. 535, 86 So. 396. If a traveler sees an approaching train and misjudges its speed, or for any reason misjudges his own ability to cross before the train reaches crossing, such traveler is guilty of negligence. Louisville & N. R. R. Co. v. Griffin, 240 Ala. 213, 198 So. 345; Southern Ry. Co. v. Summers, 232 Ala. 417, 168 So. 179. Though a railroad violated crossing statute, if plaintiff was guilty of negligence proximately causing accident, or concurred with railroad's failure to comply with statute or ordinance, plaintiff cannot recover for simple negligence. Southern Ry. Co. v. Miller, 226 Ala. 366, 147 So. 149.

"The law imposes a continuing duty to see that the way is clear before attempting to cross railroad tracks. Southern Ry. Co. v. Randle, 221 Ala. 435, 128 So. 894, 897; Southern Ry. Co. v. Miller, supra. If plaintiff did stop, look and listen within ten or fifteen feet of track and failed to see or hear train in full view, a short distance away on a straight track of 276 feet, plaintiff was negligent in one or the other respects, and appellants had a clear right for the affirmative charge. Alabama G. S. Ry. Co. v. Durr, 222 Ala. 504, 133 So. 56; Atlantic Coast Line Ry. Co. v. Flowers, 241 Ala. 446, 3 So.2d 21; Louisville & N. R. R. Co. v. Cloud, 207 Ala. 373, 92 So. 550. If a person stops at a crossing and lingers there fifteen to twenty minutes, looking and listening, and delays crossing until a train not in sight or hearing when he stopped, looked and listened, has come meantime upon the scene and collides with him when he does attempt to cross, he cannot recover. Southern Ry. Co. v. Summers, 232 Ala. 417, 168 So. 179."

The foregoing statement of the effect of the authorities cited does not sufficiently take into account the question of subsequent negligence on the part of defendant's agents in charge. According to the evidence, the train proceeded from the curve to crossing in about 6.2 seconds. Hence the necessity for observing statutory signals.

Pertinent phases of the evidence may be stated as follows: Plaintiff's witness Gamble testified, in substance, that he heard the collision; heard the train give three or four little blasts just about a minute right along the time the impact was and did not hear the bell ringing at all. On cross examination he said he did not see the train coming around the curve. It was in the cut and he did not hear it until it blew. The way he was driving, traveling east, toward the railroad, he did not see the Bailey truck coming. "The first thing I heard was the engineer started blowing his whistle. The next thing I heard was the collision. I didn't see the collision although I was headed East. I did not see the engine on the crossing nor did I see the truck around the crossing." On redirect examination this witness said that he didn't know which he heard first, "the noise of the collision or the blowing of the first blast of the whistle. They were so close together, I would not say which was first." And Mrs. Gamble, who was riding with her husband, testified: "I imagine it was 100 or 50 or 100 feet, something like. that, north of intersection of New Castle Road and Springdale Road was where we were when we heard this whistle of the train. It was three blasts, two or three little short blows, little ones. It was during the time I was hearing these blasts that I heard the impact."

Horace Gamble, who was helping his father and mother move their furniture, was in their truck about 150 yards ahead of his parents, who were in their car. He said, among other things, that:

"I saw Devoda Bailey that day near L. & N., while I was moving my father's household goods. I saw Devoda in that

same truck there on the day near the crossing. He threw up his hand and hollered at me. He was stopped approximately 50 or 60 feet from the crossing. Right in front of the negro house on my right side of the road stood an automobile headed towards the truck,—nobody in it. I came on down the Springdale road, crossed the tracks—crossed the tracks on the Springdale road, and came past the vehicle which was stopped there. Devoda Bailey stopped with the front of his truck just far enough so you could come around the vehicle and got back to your side of the road. I went up the hill. Did not hear anyhing. * * *

"Q. Did you hear the train blowing the whistle or the train bell when you passed there? A. No, sir, I did not."

Edna Mae Smith and Mrs. Autie Lee Smith, who live within a short distance of the railroad track, testified that they heard the train coming, did not hear any whistle or bell ring until about the same time they heard the impact of the collision.

Cornelius Fritz and Fred Reed, who were riding in the truck with plaintiff's intestate, testified, in substance, that they stopped the truck about in front of the Lucas house and let a truck go by; that they stopped again between that stop and the track; stopped between 12 and 15 feet from the railroad track, and when the truck stopped near the track they looked each way and did not see a train coming.

Cornelius Fritz testified that he looked as far as the curve and didn't see any train; didn't hear the train whistle nor the bell ring and further: "Mr. Bailey started the truck up, he looked good and he didn't see the train and did not hear the bell, so he started to go over. I saw the train. The truck, when I saw the train, was just about this much [indicating] over the front rail." And "The truck just got across the first rail and I looked and I said, 'Look there Boss, there is a train.' It was coming close as the corner [indicating about 50 feet]. I don't know what I did next. When I came to I was in the hospital. I never heard the train blow or the whistle ring before it hit. The train looked to be coming fast, how fast I can't tell. I never drove one and I don't know about the speed but I know it was coming."

On cross examination the witness testified: "Mr. Bailey stopped this truck about 12 or 15 feet east of the railroad track. Mr. Bailey, the driver, was on the left hand side, Mr. Reed was in the middle. I was on the right hand side. I don't know how long the truck stopped at that place. * * * It looked like to me about fifteen or twenty or thirty minutes,. * * *. That is my best judgment. * * * I mean minutes, not seconds. I said minutes. If I said seconds, I would have said seconds, but I said minutes.. Yes, sir, I said minutes. * * * Mr. Bailey and me were looking up and down the track both ways to see if a train was coming. There wasn't any train in sight. * * * The motor on the truck was running. * * *

The witness Fred Reed, Jr., testified for the plaintiff, as follows: "I was riding in the middle of the cab. Cornelious Fritz was riding in the truck on the right. Devoda Bailey was doing the driving. I know where some colored person lives in a colored house just east of the crossing. We passed a truck just before we got to the track. The truck I was in stopped when other truck passed. Then it pulled ahead, then stopped before it reached the first L. & N. tracks there. It was our truck stopped about ten feet from the track the last time it stopped. I glanced up the track and I did not see any train, nor hear any bell ringing or whistle blowing. After looking, the truck started up. I just glanced the track before it hit. As I glanced the track, there was a little bit of the front end of the truck on the track. Neither Devoda Bailey or myself said anything. I did not hear the whistle blow or the bell ring before the actual impact took place."

And on cross examination the witness Reed testified: "* * * We were not driving fast when we passed the 'Slow' marker. That is where he put it in gear, when he went down the top of the hill. It was going slow. He was traveling coming down to the point where he met the other truck ten or fifteen miles an hour. He stopped the truck there the first time. * * * Mr. Bailey stopped the truck there first about 50 feet east of the railroad track. That was the first stop right in front of the negro house. After the other truck passed us, Mr. Beiley drove on down and stopped again within ten feet of the railroad track. * * * When the truck stopped about ten feet east of the northbound track, it was already in gear and it

remained in gear from that stationary position. Mr. Bailey started then on the journey across the railroad. The front wheels got on the railroad track when the accident occurred. I was in the middle of the seat and I did not see the train at all until I just glanced it at the instant of contact. The train was right on us. The window had previously been broken out on the door on Mr. Bailey's side. There was no window in it. There was nothing connected with the truck which would obstruct Mr. Bailey's view down the railroad track. The railroad track was clear and open to the south. * * * From the time the truck last stopped until it got on the railroad track, he had it in gear and barely creeping down. * * * Between the time he stopped there about ten feet from the railroad track and the time the truck went on the railroad track, there was nothing to obstruct, or keep him from putting his brakes on. He had it in gear; he did not put his foot on the clutch. * * *."

In his answer to interrogatories and in his testimony the engineer stated he was doing all in his power and everything known to skillful engineers "to *bring the engine to a stop* in the shortest possible distance"; causing all alarms and signals to be given and sounded; saw the automobile prior to the time of collision when the engine was 136 feet south of the crossing and in his judgment the truck was then 25 feet from the track and traveling six or eight miles an hour, progressing slowly down to a stop; that he applied his brakes in emergency when "about 25 or 30 feet from the crossing"; that he was "continuing to blow the road crossing signals when he first saw the truck, which was two long blasts of the whistle." He further said of signals given that they consisted of continuous ringing of locomotive bell by an air driven bell ringer and intermittent blasts of locomotive whistle, four blasts of the whistle. After the presence of the truck was discovered, the engineer continued the blowing of the whistle, and the instant it was discovered that the truck would go on the track without stopping, the air brakes were applied in emergency application, and at the moment of the collision the engineer was stopping the train and giving signals by whistle and bell. And in answer to the interrogatory, "State specifically and in detail how said collision occurred?" the engineer answered: "Train approached crossing from south, running 35 miles an hour. Locomotive was

within 136 feet from crossing when automobile appeared 25 feet east of track. Truck was moving very slowly. It appeared that the driver was aware of the train's approach. The whistle was blowing. The train visible to the driver and the slow movement of the truck led engineer to believe it would stop within the distance between the truck and the track before driving truck on track, the intervening distance being sufficient to stop under the circumstances. When the front of the locomotive was within 50 feet of the crossing the front of the automobile truck reached a point dangerously near to the track, and at this instant the train brakes were applied. At practically the same moment the driver of the truck left the truck cab, and upon reaching the ground he undertook, apparently, to cross the track in front of the train. After the driver left the truck cab, the truck continued to roll closer to the track."

The evidence shows that on the east side of the track there was an embankment between 20 to 25 feet from the track which prevented the engineer from seeing the truck until the front end of it reached that distance from the track, and the locomotive struck the side of the automobile truck immediately ahead of the driver's cab.

The engineer operating the train at the time of the accident testified for the defendant that the train had a full crew on the day of the accident; that the brakes were in first class condition; that the accident happened at 12:32 noon; that he gave signals by bell and whistle, having started the bell to ringing when the train left Birmingham, and it had not been cut off, but was ringing at the time the accident occurred. The regular road crossing whistle was given, started a quarter of a mile south of the crossing—two longs, one short and one long. That the railroad track south of the crossing is straight for 276 feet; on the east side of the track there is an embankment about 25 feet from the railroad track which extends down to the curve and is higher than the engine. The embankment at its intersection with the Springdale Road is not so high, but is probably five or six feet high at this point. The track next to the embankment is the north bound track over which north bound traffic travels, and that was the way the engine was going on this occasion. He testified further, "I was looking straight ahead as the engine passed around the curve run-

ning about 35 miles an hour and when I came around the curve there was no automobile truck on the crossing nor approaching within my view. I continued to run the train approaching the crossing at about the same speed but before I got to the crossing, I saw this truck, my engine was around 135 feet from the crossing. The truck was about 15 feet east of the railroad. It was in motion, going about six miles an hour, when I first saw it driven towards the crossing. I continued to blow the road crossing signal. When I first saw the truck traveling about six miles an hour, it appeared to be slowing up like it was going to stop. Between the time I first saw the truck, and before it got on the tracks, it appeared to me he was going to stop. There was nothing between the truck and my engine from the time the truck first came into view, and no obstruction of any kind. I can't say that I could tell the truck was occupied when I first saw it, just the instant after that I saw somebody in the truck. I saw someone jump out of the truck on the left side toward the engine and run around in front of the truck just a second before I hit the truck. I applied my brakes on the engine about 25 or 30 feet south of the crossing in my best judgment. The engine was about 30 feet from the crossing when I saw this man jump. I put the brakes on in emergency, which is the quickest way to stop a train in the shortest possible distance in an emergency. There was nothing else that I could have done at that time to retard the speed of the train. The application of the brakes brought the train to a stop in the shortest possible distance, 500 feet north of the crossing. The engine struck the truck it looked like just ahead of the cab and slid it around across the ditch on the north side of the highway, annd left the truck standing, front end standing against the embankment on the other side. I continued to look at the truck from the time it first came in my sight until the collision occurred. I was blowing the whistle when the truck came in sight, but not the last whistle. It was about the second long blast. The whistle continued to be blown from the time the truck first came in sight to the contact. I was traveling down grade."

It may be observed that to recover for subsequent negligence, plaintiff must prove that at the time of the injury, or immediately before it, he was so circumstanced, to the knowledge of defendant's agent in charge, as that after discovery of the perilous situation, said agent could, by the exercise of due diligence and application of the means at hand, have prevented the injury. Louisville & N. R. R. Co. v. Moran, 190 Ala. 108, 66 So. 799; Atlantic C. L. Ry. Co. v. Flowers, 241 Ala. 446, 3 So.2d 21; Louisville & N. R. R. Co. v. Sullivan, Ala.Sup., 13 So.2d 877.[1] As to subsequent negligence, the burden is on the plaintiff to show that the engineer or other agent in charge discovered that intestate was in peril of collision, and that the discovery was in time to warn of the impending collision, and by the means at hand could have prevented it, and negligently failed to give such warning, or to use such other available means at hand to prevent the collision and resulting injury of which complaint is made. Louisville & N. R. R. Co. v. Griffin, 240 Ala. 213, 198 So. 345.

In view of the exceptions taken and now urged as error in the trial court's charge to the jury, and later the attempted withdrawal thereof from consideration, we advert to the statutes and decisions thereunder, having application under the old statute. In East Tennessee, Virginia & Ga. R. R. Co. v. Deaver, 79 Ala. 216, 220, the rule is thus stated: " * * * The engineer is required to blow the whistle, or ring the bell, before entering any curve crossed by a public road on a cut, when he can not see at least one fourth of a mile ahead, and to approach such crossing in such cut at such moderate rate of speed as to prevent accident in the event of an obstruction at the crossing. In Mobile & Mont. Railway Co. v. Blakely [supra], 59 Ala. 471, speaking of this provision of the statute, it is said: 'To come within this clause, there must be a *curve* crossed by a *public road* on a *cut,* so that the *crossing,* and any *obstruction* upon it, can not be seen a *fourth of a mile ahead.' * * * *" [Italics supplied.]

The words of the old statute "on a cut" were eliminated in Code 1886, § 1144, and continued to be omitted from other codes up to and including Code 1940, Tit. 48, § 170. The foregoing construction was applied in Atlantic C. L. R. Co. v. Jackson, 221 Ala. 646, 130 So. 388; Southern Ry. Co. v. Hale, 222 Ala. 489, 133 So. 8. See, also, Miles v. Hines, 205 Ala. 83, 87

So. 837. The evidence in this case, however, shows that the provisions of § 170, Title 48, Code of 1940, relating to speed approaching a curve have no application to the crossing where the instant collision occurred. It is uncontroverted that the crossing and collision were on a straight track, 276 feet from the curve in the railroad track, and less than one-fourth of a mile ahead as the train proceeded, and which crossing and approaches thereto could not be seen on the curve in question.

The defendant's counsel excepted to certain portions of the court's oral charge, which will be set out in the statement of facts, touching the duty required by the statute of the engineer as to signals, and control of the train approaching a crossing on a curve. Whereupon the following colloquy occurred:

"Mr. Windham: In order to avoid any question about the curve the plaintiff would like for your Honor to tell them you withdraw any question about the curve.

"The Court: If you read that section of the Code I think you will see it says—

"Mr. Taylor: What we are saying, if your Honor would just withdraw that part about the curve—

"The Court: I think what I said is the law, but I am willing to do it.

"Mr. Windham: We think it is the law but we are willing for your Honor to withdraw it.

"Mr. Gibson: It is not a question of consent on the part of counsel. It is a question of law, whether your Honor is right or wrong.

"The Court: I think I am right. One was the question—he is planting himself on the question about blowing the whistle or ringing the bell a quarter of a mile before a road crossing. Then I went further and read you the section about a railroad crossing in a curve, and that he must ring the bell or blow the whistle a quarter of a mile ahead of the crossing at short intervals until he had passed the curve. I withdraw that.

"He plants himself on the proposition he must ring the bell or blow the whistle at least a quarter of a mile before reaching the crossing and at short intervals thereafter.

"My [Mr.] Eyester: We would like to state to the Court we still insist on our exceptions.

"The Court: Yes.

"I will withdraw my remarks about the curve. There are two alternatives. They stand on the one about a quarter of a mile before they reach the crossing. That is the one they stand on.

"Mr. Taylor: You have the two propositions. He gives you the first proposition. He says the engineer did not blow the whistle or ring the bell a quarter of a mile before reaching the crossing.

"The remarks about the curve I strike out as surplusage and unnecessary.

"Mr. Eyester: We still retain our exceptions, and except to your Honor's subsequent charge there are two propositions and one of them is withdrawn.

"The Court: Yes, sir.

"If the Court tells you more than he cared to tell you, or wanted to tell you, and that part is withdrawn, I think that renders the thing innocuous.

"You may take the case."

It will be observed from the foregoing that the court eliminated the instruction as to the situation touching the duty of an engineer in handling his train when approaching a curve which a public road crossed. Code 1940, Tit. 48, § 170. We have indicated that the evidence shows the crossing was not on the curve and that the collision occurred 276 feet from the curve, and which point the engineer could not see though it was less than one-fourth of a mile ahead. Thus the court withdrew from the jury the said matter on which he had specifically instructed in his oral charge. In this there was no error to reverse.

We have carefully considered all the evidence as to the insistences of defendants-appellants for the affirmative instructions. The rule long prevailing in this jurisdiction prevented the giving of such affirmative instructions. McMillan v. Aiken, 205 Ala. 35, 88 So. 135.

We have examined all errors based upon objections to the introduction of testimony and find they are without merit. For example, assignments of error on the questions to Mrs. Gamble: "Was there any bell ringing on the train before the collision?" and "Did you hear the train blowing the whistle or the train bell when you passed there?" There was no error in the rulings touching such evidence. It was a material inquiry for relevant facts.

The burden of proof was upon plaintiff to show the death for which suit was brought under the statute. Thus the death certificate of Devoda Bailey was introduced in evidence without error.

Charges 26 to 28 are considered together by appellants. It appears that charges 26 and 28 are the statement of material facts touching subsequent negligence of the plaintiff. The court charged orally on subsequent negligence of the defendant and of the plaintiff. He concluded his instructions as follows:

" * * * The immediate cause, the proximate cause, in the law, is the responsible cause of the injury, caused it in other words. Then that would be actionable if it were the proximate cause of the injury, and if, dealing with sort of situation, the boy failed to stop, look and listen, that would defeat the father's right of recovery, because under the circumstances I told you about, it was his duty to stop, look and listen before—immediately before—at a point of vantage, such as I have defined to you,—before attempting to cross the track. Now, if the boy failed to do that he can't recover—it would defeat the right of recovery under the question of simple negligence.

"Now, while all that is true,—the question is very simple so far,—the question then looms up was there subsequent negligence here or not. You have got to go into that because if there was subsequent negligence which proximately, that is to say, directly caused the injury, then that would be the proximate cause instead of the other one I have been talking to you about, which would be the remote cause as the simple negligence. Consequently, you have got to put your finger on the causation of the thing, and say what was the proximate cause of the injury to the boy.

"Now, how quick did this thing happen? After the engineer saw the boy and discovered his peril, in other words, was conscious of it, aware of it,—that is what you mean by subsequent negligence,—then did he do all he could have done or might have done under the circumstances he had the means of doing and time to do, and did he use effectively those means to avert an accident? It does not mean necessarily he did everything he might have done, but did he do those things he had time to do, and that would be most effective under the circumstances to avert ehe [the] accident,

such as ringing the bell or blowing the whistle? Did he do it or fail to do it?

"Now, whether the boy was conscious of his peril concurrently with the consciousness of the engineer,—you are dealing with a new picture of the situation,—was the boy concomitant therewith negligent or not? Of course, if the boy were guilty of subsequent contributory negligence that would still be a bar to recovery and would defeat recovery against the railroad company,—if the boy were guilty of subsequent contributory negligence, and the engineer was also guilty of subsequent negligence. Now, I don't know whether you have got that or not.

"Now, then, you go back there and discuss the thing among yourselves, analyze it, try to thresh it out—try to find out what the facts are, just how the thing occurred, and then you will try to make application of these principles I have been telling you about to ascertain whether or not there is a right of recovery."

The oral and given charges sufficiently covered the questions of fact sought to be given by charges 26 and 28, refused to the defendant. Atlantic C. L. R. Co. v. Flowers, 241 Ala. 446, 451, 3 So.2d 21; Alabama G. S. R. Co. v. Moundville Motor Co., 241 Ala. 633, 4 So.2d 305.

Charge 31 was refused without error. The court instructed as to the duty of the driver of the truck before and at the time of his entry upon the track and that of the engineer after his first discovery of the truck. The machine would not have been at the time and place under the circumstances, when it was observed by the engineer without a driver or occupant thereof, and when so observed by the engineer, it became the duty of the engineer to do his duty in the premises with the means at hand and as the conduct, omission, acts and circumstances of the intestate would reasonably indicate as necessary to avoid the collision. This phase of the evidence was covered by the oral charge of the court and the given instructions requested in writing by the defendant.

Charges 13 and 14 are in substance excerpts from Richmond & D. R. Co. v. Freeman, 97 Ala. 289, 11 So. 800; Shannon v. Jefferson County, 125 Ala. 384, 27 So. 977. The trial court instructed the jury as follows: "Now, then, if you are reasonably satisfied, after discussing the thing, there is a right of recovery that would carry you

into the realm or question of damages. The damages in a case of this sort are punitive. The word 'punitive' means by way of punishment. That is what it means, and there is no yardstick that I could lay down and give you by which you can measure the damages. It is a matter that is addressed to your sound and honest discretion under the circumstances, having due regard to the enormity of the wrong and making it accordingly fit, such as you think would be a fit and proper deterrent under the circumstances. It is not an unbridled discretion, but *one of honest discretion to be exercised by the jury in their honest discretion, having due regard, as I say to the enormity of the wrong."* [Italics supplied.]

The foregoing oral charge stated the law governing the measure of damages. It did not, however, require the giving of defendants' requested charges 13 and 14.

The questions we have treated, together with other matters, are made the grounds for a motion for a new trial. It is not necessary to further consider such question. The damages fixed by the jury were warranted under the evidence, and the grounds that the same are excessive were not well taken.

We find no error in overruling the motion for a new trial.

The judgment of the Circuit Court is affirmed.

Affirmed.

GARDNER, C. J., and BOULDIN, BROWN, FOSTER, LIVINGSTON, and STAKELY, JJ., concur.

On Rehearing.

PER CURIAM.

Application overruled; opinion extended.

THOMAS, BOULDIN, LIVINGSTON, and STAKELY, JJ., concur.

GARDNER, C. J., and BROWN and FOSTER, JJ., dissent.

GARDNER, Chief Justice (dissenting).

Upon reconsideration of this cause, I am persuaded an erroneous conclusion has been reached.

This unfortunate accident occurred at a public road crossing where the track was straight. As the original opinion discloses, the crossing was not on a curve, and of course, that feature of our statute (Title 48, § 170, Code 1940), relating to speed of the train so as to prevent accidents approaching a crossing on a curve, was without application. But the trial court made reference more than once to that feature of the statute, and exceptions were duly reserved by the defendant. Looking at the matter from a practical standpoint, the jury must have been impressed with this reference by the trial judge to that feature. As I understand it, it is practically conceded that these instructions were erroneous. But the effect of our holding is that this error was without injury for the reason that the court withdrew the instruction from the jury. Had the trial judge stated to the jury that, in his opinion, a mistake had been made in this regard and that that feature of the statute had no application, I would readily agree. But such is not the case. The record discloses that counsel for the plaintiff desired the court to withdraw that feature of his instructions, and that the court then stated he thought what he said was the law but he was willing to withdraw it. Then associate counsel for the plaintiff said that he, too, thought it was the law, but that they were willing for it to be withdrawn. Following that, the court said: "I think I am right," with other statements which are set out but are not necessary here to repeat. Later, the court withdrew the remarks.

I find myself unable to agree that this was an effective withdrawal. The jury looks to the judge for the law of the case, and the natural conclusion is that the jury understood the judge was still firmly of the opinion that was the law, but was merely willing to make a withdrawal because counsel for the plaintiff had so consented. This was a matter of some consequence, and I am persuaded it was not without its effect upon the jury.

But coming to a consideration of the merits of the case, I am further persuaded plaintiff has failed to show a right of recovery. The accident occurred at noon on a clear day. Plaintiff's witnesses testify to the automobile having stopped for a period of 15 or 20 minutes 10 or 15 feet from the track, and that they looked and listened and saw no approaching train. The track was straight for a distance of 276 feet, at which point there was a sharp curve. The train was approaching at a speed of 30 or 35 miles per hour. As to whether or not the statutory signals were given for this

crossing the evidence is in dispute. Undisputedly, plaintiff's intestate was entirely familiar with this crossing.

If plaintiff's intestate stopped the car within 10 or 15 feet of the track, and if the train at that time was in full view, the denial of the witnesses that they did not see the approaching train must be put down among the impossible. Undisputedly, there was no obstruction to the view at that point, and plaintiff's intestate, driving the truck, was sitting on the left side, from which direction the train was approaching. It is a well established rule in this Court and generally recognized throughout the country that when facts are admitted which conclusively establish another fact, the mere denial by a witness of the existence of the fact so established does not and should not create that material conflict in evidence which requires the submission of the issue to the jury. This principle is found discussed with much amplification and citation of authorities in Peters v. Southern Ry. Co., 135 Ala. 533, 33 So. 332; Louisville & N. R. Co. v. Moran, 190 Ala. 108, 66 So. 799; Southern Ry. Co. v. Irvin, 191 Ala. 622, 68 So. 139, and needs no further elaboration here.

And the authorities cited in the original opinion clearly disclose that in the instant case there was a duty to stop, look, and listen, before going across this track, and that this was a continuing duty. Numerous authorities to this effect are found cited in Schloss-Sheffield Steel & Iron Co. v. Willingham, 243 Ala. 352, 10 So.2d 19; Schloss-Sheffield Steel & Iron Co. v. Peinhardt, 240 Ala. 207, 199 So. 33; Johnson v. Louisville & N. R. Co., 227 Ala. 103, 148 So. 822. "The duty of plaintiff to stop, look, and listen was a continuing one, which persisted to the moment of the collision." Southern Ry. Co. v. Miller, 226 Ala. 366, 147 So. 149, 151.

In Johnson v. Louisville & N. R. Co., supra [227 Ala. 103, 148 So. 827], it was observed: "He must stop so near to the track, and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked, and listened and his attempt to proceed across the track. If he stops so far from the railway as that a train which could not be seen from that point could and does reach the crossing by the time he has traversed the intervening distance and gotten on the track, he negligently contributes to the resulting collision and injury. And the same is true if, though he stop at the track, he lingers there after looking and listening, and delays crossing until a train not in sight or hearing when he stopped, looked, and listened has come meantime upon the scene and collides with him when he does attempt to cross."

Under this well-known rule, therefore, if at the time plaintiff's intestate started his truck across the track, the train was not yet in sight, it was still a continuing duty on the part of plaintiff's intestate before going upon the track to see that the crossing was clear of danger from approaching trains. Indeed, one of plaintiff's witnesses testified that he called the attention of plaintiff's intestate to the train just as the truck was in the act of passing over the first rail of the track (the truck was sideswiped), thus indicating clearly that he saw too late what he could well have seen a moment earlier and the accident thus avoided. I think it, therefore, clear enough that contributory negligence on the part of plaintiff's intestate would bar recovery for any initial negligence on the part of the defendants for failure to observe the statutory signals. Southern Ry. Co. v. Hale, 222 Ala. 489, 133 So. 8. The more recent case of Atlantic Coast Line R. Co. v. Flowers, 241 Ala. 446, 3 So.2d 21, is illustrative and here much in point.

If recovery, therefore, is to be had, it must rest upon the doctrine of subsequent negligence. But I am persuaded the evidence does not suffice to sustain a recovery upon this theory. Such negligence must, of course, occur only after discovery on the part of the defendant's employees that the plaintiff's intestate was in peril. The evidence is to the effect that the engineer made such a discovery only a very short distance from the crossing and that he did all within his power at that moment, which was too late. When we consider the speed of the train and the distance to be travelled— 276 feet from the curve to the crossing— and the speed of the truck as it approached the crossing, it is clear enough it was a matter of seconds only from the time plaintiff's intestate gave indication that he would not stop until the moment of impact, all of which tends to prove only the "unity of the whole transaction," as observed by the United States Supreme Court in St. Louis Southwestern Ry. Co. v. Simpson, 286 U.S.

346, 52 S.Ct. 520, 522, 76 L.Ed. 1152, quoted approvingly in Southern Ry. Co. v. Miller, supra.

I am convinced that any recovery for subsequent negligence in this case would rest upon a mere conjecture, an insufficient basis for the foundation of a verdict, as here often declared.

I, therefore, respectfully dissent.

BROWN, J., concurs in the foregoing views.

FOSTER, J., entertains the view there was no subsequent negligence shown and that reversal should be rested upon that theory.

BROWN, Justice (dissenting).

Section 170, Tit. 48, Code 1940, dealing with the "duty of engineer as to ringing bell and blowing whistle," is in the same language it was in the Code of 1923 when the case of Miles v. Hines, 205 Ala. 83, 87 So. 837, was decided. The statute as it then stood in respect to public road crossings was reproduced in the opinion. There is no conflict between that case and Atlantic Coast Line R. Co. v. Jackson, 221 Ala. 646, 130 So. 388, 389. The court was there dealing with an excerpt from the oral charge of the trial court in the following language: "Now, if it was a public road then a certain duty rests upon the railroad company must approach that crossing at such a rate of speed,—it must have its cars properly equipped, and the engine, and then they must approach that crossing with their train so *under control as that they may be able to stop that train within the vision of an object at that crossing.*" [Italics supplied.]

As stated in the opinion of the court, the crossing was on a straight track and the holding in that case was: "Our statute requires *slowing down only at one class of crossings—a crossing on a curve* where the trainmen cannot see at least one-fourth of a mile ahead. Code, §§ 9952 (5473). A crossing of this class is singled out, it would seem, not only because of the inability of the trainmen to see the crossing in time to avoid injury, but also because usually it is more difficult for the traveler to conserve his own safety by observance of due care at such a crossing. Under the evidence and under the instruction in question this class of crossing is not involved." [Italics supplied.] 221 Ala. 648, 130 So. 389.

Nor is there any conflict between Miles v. Hines, supra, and Southern Ry. Co. v. Hale, 222 Ala. 489, 133 So. 8, 9. We quote from the opinion in that case: "The crossing was not on a curve, though there was a curve some 200 or 225 feet below the crossing, somewhat obstructing the view at that point. Plaintiff's counsel cite the statute (section 9952, Code 1923) as applicable, especially to the question of speed shown to be from 30 to 35 miles per hour. But, as pointed out in the recent case of Atlantic Coast Line R. Co. v. Jackson, 221 Ala. 646, 130 So. 388, following the older authority of East Tennessee, Va. & Ga. R. Co. v. Deaver, 79 Ala. 216, that feature of the statute is without application to such a crossing."

The first clause of the statute, "The engineer or other person having control of the running of a locomotive on any railroad, must blow the whistle or ring the bell at least one-fourth of a mile before reaching any public road crossing, * * * and continue to blow the whistle or ring the bell at short intervals, until it has passed such crossing," is clearly applicable to the instant case, and a failure to observe these requirements would constitute simple negligence. Miles v. Hines, supra.

In the light of the many decisions of this court in respect to contributory negligence, restated in Johnson v. Louisville & N. R. Co., 227 Ala. 103, 148 So. 822, I am of opinion that the plaintiff's intestate, on the undisputed evidence, was guilty of contributory negligence, which would bar a recovery as for simple initial negligence, and am further of opinion that the engineer was not guilty of subsequent negligence proximately causing intestate's death.

The truck approached the track at a slow speed and passed over the first rail in such close proximity to the approaching locomotive as that nothing could have been done to avert the collision other than that which was done. The evidence is without dispute that the alarm was sounded and the brakes applied in emergency as soon as the peril of intestate was discovered.

However, if it be conceded that there was a scintilla of evidence supporting the assertion that the engineer was guilty of such subsequent negligence, the verdict was contrary to the great weight of the evidence, and should not be allowed to stand.

I also concur in the opinion of GARDNER, C. J.