36 So.2d 460

### LOUISVILLE & N. R. CO. v. SIMMONS.

6 Div. 653.

Supreme Court of Alabama.
Feb. 26, 1948.

Rehearing Denied July 31, 1948.

Chas. H. Eyster, of Decatur, and Gibson & Gibson, of Birmingham, for appellant.

Taylor, Higgins, Koening & Windham, of Birmingham, for appellee.

BROWN, Justice.

This is an action of trespass on the case instituted by appellee against appellant, the Louisville & Nashville Railroad Company, a corporation, G. W. Morgan, W. L. Wood, Steve Barrett, Jasper Jackson, Pat Barnett, John Doe and Richard Rowe, the complaint averring that the last two parties were unknown to plaintiff, to recover damages for personal injuries alleged to have been inflicted upon plaintiff "as a proximate result of the negligence of the defendants."

The evidence shows that G. W. Morgan was the engineer in charge of and operating appellant's locomotive pulling a freight train over defendant's Cane Creek Branch between Powhatan and Boyles, which passed through Crocker's Junction and over Divide Crossing on the occasion of plaintiff's alleged injury. Andrew B. Luster (not a party defendant) was the fireman.

The complaint was amended on the first day of the trial by withdrawing all counts of the complaint except count 1, and striking all parties defendant except the corporate defendant and the engineer Morgan. On the third day of the trial plaintiff again amended his complaint by adding count A. The case was submitted to the jury on count 1 as to both defendants and on count A as to the railroad company. The court gave the affirmative charge requested by the defendant Morgan in writing as to count A. The trial resulted in a verdict and judgment against the railroad company for $20,000, but acquitting the engineer of liability. From that judgment the railroad company prosecutes this appeal.

The evidence is without dispute that the tracks of the appellant, the Louisville & Nashville Railroad Company, pass over what is known as "Divide Crossing" and for the purpose of the trial in this case the defendant railroad company conceded that Divide Crossing was a public road crossing. The road itself is a dirt road in a sparsely inhabited community with two travel tracks or ruts made by vehicles, with grass growing between. There were no crossing signs at the crossing and the travel over this road was infrequent. The plaintiff lived with his father as a member of the family near the crossing and was familiar with

the crossing and the road and traveled it frequently. The defendant maintained a section crew for keeping up its Cane Creek Line on which the crossing is situated near the top of the ridge and which was subject to erosion from rainfall. A heavy rain fell at this crossing on the night after plaintiff received his alleged injuries. The section crew repaired the tracks on this crossing a week prior to the accident by filling in the road crossing with cinders and had inspected this crossing daily. Said alleged wire cable was not placed in said roadbed between the tracks by the section men and they had no knowledge of its existence until after the alleged injuries. In fact, so far as appears from the evidence, no one had ever discovered the imbedded cable in between the rails until the day after the alleged injury.

The crossing is located on a two percent curve which is approached as the road leads from Divide Switch on a three percent curve. As the locomotive entered upon the curve on which this crossing is located, the engineer could not see one-fourth of a mile ahead. The locomotive which allegedly caused plaintiff's injuries approached Divide Crossing going east passing through Divide Station pulling a train of twenty-two cars all loaded except two and until it reached within three or four hundred feet of the crossing, it was pulling upgrade working steam. After the tracks pass the switch next to the crossing the grade is downhill and both the engineer and the fireman were keeping a general lookout ahead during the last four hundred feet before the engine reached the crossing. The fireman was at his post on the left or north side of the cab and when the head of the engine came within 400 feet of the crossing he had a full view of the crossing until the engine was within about 100 feet thereof, when the crossing passed out of his view. The crossing came within the engineer's view when the front of the locomotive was within 115 to 120 feet thereof. The train was moving from 20 to 22 miles per hour. It required a space of three seconds for the brakes applied in emergency to take effect and the train which was covering 30 feet per second could not be stopped within less than 250 to 300 feet.

The plaintiff testified at the time he stepped over the south rail the train was only 75 yards or 225 feet from the crossing, and the evidence shows that but for the fact that his trouser cuff was caught by the wire he had ample time to clear the track before the train reached the crossing. The brakes were not applied, as the engineer and fireman testified, for the reason that there was no one at or near the crossing as the locomotive reached and passed over the same.

The evidence was in dispute as to whether or not the crossing signals were given. Some of plaintiff's witnesses testified that they could hear the train pulling the grade before it reached Divide Crossing, a quarter of a mile away.

The plaintiff testified as a witness in his own behalf.

"Now, as you go west, that is, in the direction the train came from, I will ask you whether or not the track is straight or whether or not it is curved? A. As I go west from the crossing?

"Q. Yes, sir. A. Well, it is curved slightly.

"Q. All right. I want to show you a picture. Is that a picture, or does that truly represent the curve in the track west of the crossing? A. Let's see now. That is west?

"Q. That would be west. There is your embankment. .

"Mr. Eyster: What picture is that, please?

"Mr. Perdue: Exhibit four.

"A. Yes, sir, it does. .

"Q. Is that the way it looks from the crossing, the curve of the track? A. Yes, sir.

"Q. And that is looking west, the direction from which the train came? A. Yes, sir.

"Q. You say you can see up there about a hundred yards, I believe? A. Yes, sir.

"Mr. Eyster: Did he say you could see a hundred yards up there?

"Mr. Perdue: That is what I understood him to say.

"A. Or a little better. I said that is where the switch is.

\*　\*　\*　\*　\*　\*

"Q. When you got there in close proximity to the crossing or got close to the crossing, what did you do, if anything? A. Well, I hesitated a moment and looked both ways and then I started on across, looked and listened.

"Q. You hesitated a moment and looked and listened both ways? A. That is right.

"Q. At that time *were* there any train in sight? A. No, sir, there wasn't.

"Q. Then what did you do? A. I started on across and my right overall leg hung on something and I tried to move on across and glanced and saw this train coming from the west direction.

"Q. Now, did you see the object that caught your overall pants or was this object covered by your overall pants? A. It was covered. I didn't see it.

"Q. When you first caught your overall in this object there where was that object in reference to the track, was it south of the track or between the track? A. It was kind of between the track.

"Q. Which side of the road were you walking on? A. Well, kind of on the left side.

"Q. Kind of on the left side? A. Yes, sir.

"Q. Well, do you know where the rut would be on that portion of the road, where the wheels of a car would ordinarily travel? A. Yes, sir.

"Q. Were you walking in one of the ruts of the road? A. Yes, sir, a little bit to the right of the left rut, it seems like.

"Q. When you became caught there in the object, what was the first movement you made, in which direction, if you can remember? A. I tried to go on across.

"Q. You tried to go on across? A. Yes, sir.

"Q. Did you trip? A. Yes, sir, I kind of tripped, and I was frightened when I saw that train. I tried to run east then.

"Q. That would be in the direction the train was going? A. Yes, sir, the same direction the train was traveling.

"Q. When you tried to go east would your back be to the train at that time? A. Yes, sir, that is right.

"Q. When you tried to go east there, were you able to get aloose? A. No, sir.

"Q. When you first saw the train after you were caught on the track, can you give us any judgment how far the train was from you when you first were caught? "A. It was approximately seventy-five yards away.

"Q. Approximately seventy-five yards away? \*　\*　\*"

On cross-examination the plaintiff testified:

"Q. And when you got close to the railroad track you say you looked and listened—looked in both directions for a train? A. Yes, sir.

"Q. But you did not stop? A. Yes, sir, I did hesitate just a minute, just a second or two.

"Q. Did you stop completely you think? A. Yes, sir.

"Q. How close were you in your best judgment to the south rail of that track when you claim that you hesitated? A. Some where in four or three feet.

"Q. Three or four feet? A. Of the south rail."

The plaintiff offered in evidence six photographs of views of the railroad and road crossing from all directions—east, west, north and south—and the surface of the crossing, made from a week to ten days after plaintiff's alleged injury, disclosing in the surface of the crossing the end of the wire cable also introduced in evidence together with a piece of cloth in between two of the wires of the cable, said wires being 1/16th of an inch in diameter. These exhibits are attached to the record in this case and are before the court. The evidence is without dispute that the wire cable (plaintiff's Exhibit 7) was not placed in the crossing by any of the railroad crew who maintained the tracks nor was it discovered by anyone until the day after plaintiff's alleged injury. It was then allegedly discovered by plaintiff's witness Esa B. Averhart known and usually called "Ted" Averhart, according to his own testimony.

He testified that he went to the scene of plaintiff's injury before the ambulance arrived to take him to the hospital and aided in picking up the severed members of his arm and leg, made an inspection of the crossing with flashlight and searched for bones and fingernails that were crushed on the tracks and at that time did not discover the end of said wire cable with the piece of cloth sticking in the wire. This witness testified that he discovered this wire on May 4th after the injury occurred imbedded in the crossing as indicated by the photograph. That it rained that night, hard, that he went back at the crossing about nine o'clock the next day. There was no one there except himself. That witness talked to a claim agent of the L. & N. R. R. Co., whose name he could not remember, before he went back to the crossing and told him about the accident and gave him a statement and didn't tell him anything about a wire being out on the crossing. That he went from the claim agent's office to the crossing, the claim agent promising to meet him there but he did not come, but he went to the crossing by himself. That he remained there twenty-five or thirty minutes looking around. No one passed by while he was there. That he did not go back to the railroad claim agent to tell him what he had found and had never seen the railroad claim agent or talked to him since the time he first talked to him. That he had never been back to the crossing since May 4th. He then testified on cross examination as follows:

"Q. Now, when you were out there the next morning all you saw was this piece of wire sticking up there about an inch or an inch and a half? A. That is right.

"Q. You didn't see any other part of it at all? A. That wire?

"Q. Yes, sir. A. No, sir.

"Q. You didn't undertake to take it out of there? A. I did not.

"Q. You didn't report it to any railroad people? A. I did not.

"Q. Did you report it to Mr. Simmons? A. I did not.

"Q. Did you report it to Mr. Harding? A. I did not.

"Q. Who did you report it to? A. Well, I heard that Mr. Perdue there had the case and had been out there and asked about me being out there, and I called him and told him about it from my work.

"Q. You called Mr. Perdue and told him about it? A. I did, sir.

"Q. When was it that you called Mr. Perdue? A. Sometime shortly after the accident. I don't know any specific date or just how long it was.

"Q. Did you have any judgment how long after the accident? A. No, sir, I don't.

"Q. Well, do you think it was as much as two weeks after the accident before you called Mr. Perdue? A. I would say more or less. I don't remember the exact date or anything like that, when it was. He had been out there to the house and I had heard he had the case, and I called him and told him who I was and about it.

"Q. Do you think it was as much as a month after the accident? A. I wouldn't say; more or less.

"Q. Or two months? A. I wouldn't say. I don't know exactly how many days or how long it was.

"Q. Well, how long before—how long after you heard that Mr. Perdue had been out there was it before you called him? A. I called him the next morning, the next day, sometime up in the morning after I got to work.

"Q. You heard he had been out there one day and you called him the next day? A. That is right.

"Q. After you called him did you go down to his office and talk to him? A. No, sir, I have never been to his office.

"Q. Did you see him or contact him again— A. I did not.

"Q.—after that? A. No, sir.

"Q. When you went back out there the next morning did you see any cloth there on the crossing of any kind? A. There was a piece of overall cuff hung in the wire.

"Q. Was that all the clothing that you saw there? A. Yes, sir, it was.

"Q. Where was his shirt sleeve with reference to the piece of wire you say you

saw? A. The old piece of shirt sleeve at that time was laying up a little piece from the arm on the inside of the rail.

"Q. Over towards the east path? A. Yes, sir.

"Q. How many strands of wire did that cable have in; do you know? A. It had around five, four or five, something like that.

"Q. Four or five? That has six doesn't it?

"Mr. Perdue: Seven, I believe.

"Mr. Eyster: Seven?

"Mr. Perdue: I think it is seven.

"The Witness: It has six.

"Q. Six? A. Six.

"Q. Was this piece of overall, according to your contention, laying down on the ground when you saw it the next morning? A. Yes, sir. There was that much (indicating) sticking up like that.

"Q. Laying down on the ground? A. Yes, sir. * * *"

The evidence is also without dispute that the highway patrolmen, two in number, who went out to investigate this accident, inspected the crossing and made a report in respect thereto, showing the location of the crossing, that there was a little used narrow road, and one of said patrolmen testified that if there had been any defects in the crossing it was their duty to report it. That they reported no defects. That on the night they were out there they did not discover the wire with the piece of overall attached to it in the crossing.

Mr. Bates, one of the highway patrolmen, testified that a week after the accident, "may be a few days one way or the other," he accompanied Mr. Perdue to Divide Crossing and assisted in digging up the wire cable, and further testified:

"Q. And when you went out there with Mr. Perdue a week or some such matter later, that was the first time that you ever saw or claimed to have seen the wire in the ground? A. Yes, sir.

"Q. And when you saw the wire on the ground there a week later was this piece of overalls on the underside of this wire as it shows here today? A. Yes, sir, I think so.

"Q. You would say that overall now, as it is produced here in court, is shown to be on the underside of that wire, wouldn't you? A. Yes, sir. My recollection is it was that way.

"Q. That is your recollection? A. Yes, sir.

"Q. Now, if you will examine that picture number five— A. Can I ask that wire be turned around?

"Mr. Perdue: Put it anyway you want to.

"A. I want to be certain on this. That is the way I remember it, like it is.

"Q. That is the way you remember it, the overall is on the underside— A. Yes, sir, it looks the same way.

"Q. Well, now, you say you were there —no, I don't believe you were there when the pictures were taken. A. No, sir.

"Mr. Perdue: The pictures were made immediately before he came there. I will have the photographer up here for you.

"Mr. Eyster: All right then.

"Q. Are the wires of that cable in the same shape now as they were when you claim to have first seen it? A. No, sir.

"Q. They are not? Did one of those wires protrude out from the other wires or stick off from them? A. Well, I don't— you mean up here?

"Q. Yes, sir, stick out to the side? A. All of them stuck out somehow. They were not all jammed—

"Q. They were not all together like they are now, were they? A. No, sir.

"Q. You are the man that helped dig it up, aren't you? A. Yes, sir.

"Q. And when you dug it up those wires were not all together like they are now? A. I don't believe they were. * * *"

Jack Harding, one of plaintiff's witnesses who lived in the same neighborhood with the Simmons' family, and to whose house plaintiff was going according to his testimony when he started across the tracks, was present at the time the wire cable was dug out of the ground between the tracks, and he testified;

"Q. Now, then, I believe you have already testified that you didn't see this wire

138

sticking up there at that time; you didn't see any patch of cloth on a wire at any time either until you went down there and dug it up, did you? A. No.

"Q. In this picture number six that I am showing you now is this the overall— is that what you call the overall there that is shown across the top of this wire?

"Mr. Windham: I object to that, if the court pleases. I don't know what he means. The picture doesn't show it, what I would call, to be across the top. Of course, that may be a matter of opinion.

"Q. Do you see what looks like a piece of cloth in that picture? A. I see something but I can't tell what it is.

"Q. You can't tell whether it is cloth or dirt or what it is? A. I wouldn't swear what it was.

"Q. Were you down there when the pictures were taken? A. No, sir, I wasn't there when the pictures were taken.

"Q. You were not there when the pictures were taken? A. No, sir.

"Q. Now, when you were down there did you see anything like that on top of any wire? A. When they dug it up they had some cloth on the wire there, some overalls, but it don't look like that.

"Q. It doesn't look like that? A. No.

"Q. When you say it doesn't look like that, you are looking at this plaintiff's exhibit number six? A. Uh-huh.

"Q. And that stuff that looks like cloth, we will say doesn't look like what you saw down there when you were there? A. No, sir.

"Q. Is that right? A. That is right.
* * *

Defendant offered evidence going to show that the space between the ball of the rail and the bottom of the pilot was three and one-fourth inches. That the locomotive when inspected at the roundhouse after the employees learned of plaintiff's injury bore no signs of having come in contact with or of having hit a human being.

The defendant offered and examined a witness by the name of Morgan who testified that at the time plaintiff was in the hospital recovering from his injuries, the witness had a son in the hospital, and on a visit to his son he saw the plaintiff and observed the nature of his injuries and asked him how he got hurt, or that in substance, and plaintiff replied that he was ashamed to tell it, but that he was hoboing on a freight train. The plaintiff offered two or more witnesses who testified that said witness was a man of bad character and could not be believed on oath. The plaintiff denied making this statement. There was some evidence tending to corroborate Morgan's testimony and the defendant offered character testimony to sustain Morgan.

The evidence shows that when plaintiff was found after his injury he was lying on the west side of the public road crossing on the outside of the south rail in the gutter near the track. There was also evidence which was undisputed that there was blood and flesh on the south rail west of the crossing the next morning after the injury.

We deem the foregoing sufficient statement of the testimony and its tendencies for the treatment of the questions of law presented by the record.

The appellant's major insistences are that the court erred in refusing the general affirmative charge requested in writing by it as to the whole case and as to each count of the complaint. And if it is not sustained in these contentions, that the verdict of the jury is inconsistent with and is contrary to the great weight of the evidence.

The burden was on the defendant, if it relied on the special defense of contributory negligence, to offer evidence to sustain the defense unless the evidence offered by the plaintiff sustained the defense. The plaintiff testified in respect to his acts and conduct before stepping on the railroad track. He testified that he "hesitated or stopped for an instant and looked and listened" and then paced the three or four feet between him and the tracks and stepped over the south rail where the pant leg of his overalls came in contact with and attached to some

object (just what plaintiff has never stated) in the crossing. He then looked, saw the train approaching 75 yards west of him. He testified voluntarily as to his acts and movements. This evidence is in conflict with the testimony of the enginemen that he was not on the crossing at any time before the head of the train reached and passed over it. Plaintiff's testimony shows that one standing at the crossing could see the railroad tracks for 300 feet or better west of the crossing. Under the undisputed evidence, the conclusion is unescapable that the train was within that 300 feet of plaintiff when he went upon the crossing. After attempting another step he looked again and saw the train approaching 75 yards away and became frightened. At the speed the locomotive was moving, as shown by the undisputed evidence, it was making 30 feet per second. If the plaintiff had observed the duty placed upon him by the salutary rule of law for the prevention of casualties at public crossings, he would not have been on the crossing within the sweep of the locomotive when it reached and passed over the crossing. It appears without conflict in the evidence, or room for adverse inference, that if plaintiff's pant leg had not been caught by the object at the crossing, he had ample time to have cleared the crossing and get out of danger from the approaching train. This is a fact of importance to be treated, after adverting to the authorities establishing the positive duty of a pedestrian approaching a railroad track at a public road crossing.

To paraphrase the observation by the court in Atlantic Coast Line R. Co. et al. v. Flowers, 241 Ala. 446 (452), 3 So.2d 21, so as to apply it to the case at hand, "This plaintiff was thoroughly familiar with the situation. There was nothing to distract his attention or cause confusion as to the proper course to pursue. If he stopped * * * and looked and listened he could and did see (or hear) the approaching train. Under the circumstances of this case, and in respect to conditions known to him, there was an absolute legal duty on the part of plaintiff to stop, look and listen for an approaching train at such time and place as would enable him to see or hear its approach in dangerous proximity, and to so conduct himself thereafter as to insure his safety, since there was nothing to distract his attention or cause confusion as to the true nature of the danger, nor other concurrent or conflicting duty resting upon him. * * *" That case reaffirmed the rule emphatically stated in Atlantic C. L. R. Co. v. Jones, 202 Ala. 222, 223, 80 So. 44, 45; Johnson v. Louisville & Nashville R. Co., 227 Ala. 103, 148 So. 822; Id., 240 Ala. 219, 198 So. 350; Alabama G. S. R. Co. v. Durr, 222 Ala. 504, 133 So. 56.

The opinion in the case first above cited differentiates that case from the Peinhardt and Willingham cases (Sloss-Sheffield S. & I. Co. v. Peinhardt, 240 Ala. 207, 199 So. 33; Sloss-Sheffield S. & I. Co. v. Willingham, 240 Ala. 294, 199 So. 28), "in respect to the very incidents which in one instance takes the issue from the jury and in the other makes it a jury question." The Peinhardt and Willingham cases are again differentiated in Sloss-Sheffield Steel & Iron Co. v. Littrell, 246 Ala. 58, 62, 63, 18 So.2d 709.

It was observed by the court in Southern R. Co. v. Summers, 232 Ala. 417, 418, 168 So. 179, speaking through Anderson, C. J.:

" 'That it is the duty of a person approaching the track of a railway for the purpose of crossing it to stop, and to look, and to listen, if need be—that is, if the exercise of the sense of sight does not suffice to fully disclose the situation for approaching trains—and that the omission of this duty, followed by injury in collision with a train, locomotive, or car while attempting thus heedlessly to cross over the track, is as matter of law negligence on the part of the traveler so contributing to the result as to defeat his action, counting on the injury as having been produced by the simple negligence of the railway company or its employees, are propositions of such universal acceptance, of such frequent declaration by this court, and of such obvious soundness that we shall neither discuss them nor cite authorities in support of them. It is equally clear on principle and authority that this duty must be performed at such time and place with reference to

the particular situation in each case as will enable the traveler to accomplish the purpose the law has in view in its imposition upon him. He must stop so near to the track, and his survey by sight and sound must so immediately precede his effort to cross over it, as to preclude the injection of an element of danger from approaching trains into the situation between the time he stopped, looked, and listened and his attempt to proceed across the track. If he stops so far from the railway as that a train which could not be seen from that point could and does reach the crossing by the time he has traversed the intervening distance and gotten on the track, he negligently contributes to the resulting collision and injury. And the same is true if, though he stop at the track, he lingers there after looking and listening, and delays crossing until a train not in sight or hearing when he stopped, looked, and listened has come meantime upon the scene and collides with him when he does attempt to cross.' Central of Georgia R. Co. v. Barnett, 151 Ala. 407, 44 So. 392, 393; Central of Georgia R. Co. v. Foshee, 125 Ala. 199, 212, 27 So. 1006; Louisville & Nashville R. Co. v. Turner, 192 Ala. 392, 68 So. 277; Saxon v. Central of Georgia R. Co., 192 Ala. 434, 68 So. 313; Southern R. Co. v. Irvin, 191 Ala. 622, 68 So. 139; Louisville & N. R. Co. v. Calvert, as Adm'r, 172 Ala. 597, 55 So. 812."

To stop or "hesitate (for a moment)," "a twinkling of an eye" (I Cor. XX, 52), a split-second, and "glance" to the east and to the west, as the evidence shows that plaintiff did, does not meet the positive requirement of the rule of law stated in the cases cited above. To so hold would make a mockery of this salutary rule promulgated and sustained through the years for the prevention of death and the destruction of property. Nor does it meet the requirements of the law as given in the charge to the jury by the trial court. Among other charges, given charge 107 asserts:

"I charge you gentlemen of the jury that one on foot who is about to cross a railroad track is legally under duty to stop so near to the track and his survey by sight and sound must so immediately precede his effort to cross over the track as

to preclude the injection of an element of danger from an approaching train into the situation between the time he stopped, looked and listened and his attempt to proceed across the track; the law imposes a continuing duty upon travelers to see that the way is clear before attempting to cross the track of a railroad."

The plaintiff, according to his testimony, was injured between 6 and 7 o'clock on May 6, 1946. On that date the sun set at twenty-seven minutes after six o'clock. And according to some of the evidence when he was injured it was dusky dark. But the undisputed evidence shows that the electric headlight of the locomotive was burning.

As observed in Atlantic Coast Line R. Co. et al. v. Flowers, 241 Ala. 446, 452, 3 So.2d 21, 25, "* * * If he stopped for the siding and looked and listened, he could and did see the approaching train. Under the circumstances of this case, and in respect to conditions known to him, there was an absolute legal duty on the part of decedent to stop, look and listen for an approaching train at such time and place as would enable him to see or hear its approach in dangerous proximity, and to so conduct himself thereafter as to insure his safety, since there was nothing to distract his attention or cause confusion as to the true nature of the danger, nor other concurrent or conflicting duty resting upon him. * * *."

But it is insisted by the appellee that § 170, Tit. 48, Code of 1940, as interpreted in our decisions, including Miles v. Hines, 205 Ala. 83, 87 So. 837, imposes on the engineer the positive duty in the circumstances disclosed by the evidence in this case, when the locomotive entered a curve crossed by a public road where he could not see one-fourth of a mile ahead, to bring his train under control and "approach and pass such crossing at such speed as to prevent accident in the event of an obstruction at the crossing," and the evidence shows that the rule was violated by the engineer. Conceding this to be true, such violation would constitute simple negligence and under the facts of this case, assuming the truth of plaintiff's testimony,

the engineer's negligence merely concurred with the plaintiff's negligence to accomplish his hurt. If the plaintiff's negligence *contributed* in the slightest degree to bring about his injury that, under the authorities, is a complete defense to simple negligence committed by the trainmen.

Appellee also insists that although the engineer and fireman testified that plaintiff was not on the crossing at the time the locomotive passed over it, it was within the province of the jury to find that the plaintiff was on the crossing and that his presence was discovered by the enginemen and that it then became their duty to use all the means at hand known to skillful enginemen to prevent plaintiff's hurt.

It is not enough that the enginemen observed the plaintiff's presence on the track, but the burden, under the last clear chance doctrine, was on the plaintiff to show that the enginemen discovered his presence and peril in time to avert his injury. Plaintiff's testimony shows that when he stepped on the tracks the locomotive was then 225 feet from the crossing and the evidence is without dispute that it would take three seconds for the brakes applied in emergency to take effect and in this space of time the train would have moved forward 90 feet, leaving at best 135 feet for the train to stop. The evidence is without dispute that with the train moving at the rate of 20 to 22 miles per hour, it was impossible to prevent the locomotive from reaching and passing over the crossing by all the means known to a skillful engineer. The failure to use such means in such circumstances does not constitute proximate actionable negligence. Louisville & Nashville R. Co. v. Griffin, 240 Ala. 213, 198 So. 345; Lambert v. Southern R. Co., 214 Ala. 438, 108 So. 255; Southern R. Co. v. Bush, 122 Ala. 470, 26 So. 168; East Tenn. Va. & Ga. R. Co. v. Bayliss, 75 Ala. 466, 472.

The fact testified to by the plaintiff that when he stepped over the south rail of the track the leg of his trousers was caught by an object which pinned him to the crossing from which he could not escape by pulling or trying to jerk loose from the object was in and of itself a new force or power intervening, sufficient of itself to stand as the proximate cause of plaintiff's misfortune and break the chain of causation arising from any negligence on the part of the enginemen. Thompson v. Louisville & N. R. Co., 91 Ala. 496, 8 So. 406, 11 L.R.A. 146; Williams, Adm'r, v. Woodward Iron Co., 106 Ala. 254, 17 So. 517. Garrett v. Louisville & N. R. Co., 196 Ala. 52, 71 So. 685. This leaves plaintiff's case to rest upon count A.

Count A is predicated on the breach of the corporate defendant's duty to maintain the public crossing in reasonably safe condition for public travel and the averment of said count that defendant negligently allowed "a metal cable or wire to become or remain imbedded at a point between the rails of said railroad track in that part of said public crossing which was then and there provided for use by the general public" carried to the plaintiff the burden of showing that said wire constituted a defect in said public crossing and that the defendant had actual notice thereof or that it was such defect and was open to ordinary observation for such length of time as to impute constructive notice to the defendant of its existence. City of Birmingham v. Scott, 217 Ala. 615, 117 So. 65; Lord v. City of Mobile, 113 Ala. 360, 21 So. 366; Town of Cullman v. McMinn, 109 Ala. 614, 19 So. 981; City Council of Montgomery v. Wright, 72 Ala. 411, 47 Am.Rep. 422; Southern Ry. Co. v. Quillen, 250 Ala. 536, 35 So.2d 193.

We have given further consideration to the evidence in this case in general conference. We are now of the opinion that the evidence presented a jury question as to whether or not said wire cable and its location on the crossing constituted a defect which rendered the crossing unsafe for ordinary public use and whether or not the railroad company had notice or knowledge of such defect.

The burden of proof was on the plaintiff to show such defect and that the defendant had notice thereof or that the cable had been imbedded in the crossing open to ordinary observation for such length of time as to impute to said defendant notice or knowledge thereof. The rule in respect

142

thereto is stated in the following authorities. Davis v. Birmingham Electric Co., 250 Ala. 98, 33 So.2d 355; Alabama Power Co. v. McGehee, 228 Ala. 505, 154 So. 105; Southern Ry. Co. v. McCourry, 221 Ala. 600, 130 So. 216; Gulf, M. & N. R. Co. v. Pistole, 218 Ala 695, 697, 120 So. 159; Gulf M. & N. R. Co. v. Havard, 217 Ala. 639, 117 So. 223; Louisville & N. R. Co. v. Stanley, 27 Ala.App. 168, 167 So. 741. We hold, therefore, that the court did not err in refusing the defendant's general affirmative charge as to said count A. The affirmative charge in favor of the defendant Morgan as to said count was properly given.

In its motion for a new trial the defendant challenges the soundness of the jury's verdict which acquitted Morgan, the engineer in charge of operating the locomotive, and finding for the plaintiff and assessing his damages at $20,000, on the ground that the verdict is contrary to the great weight of the evidence.

The acquittal of the engineer of negligence by the verdict and judgment must necessarily be eliminated in considering the soundness of the verdict against the corporate defendant. Such acquittal relieved the railroad company of any liability arising from negligence imputed to the defendant Morgan. Pollard v. Coulter, 238 Ala. 421, 191 So. 231; Walker v. St. Louis-San F. R. Co., 214 Ala. 492, 108 So. 388; Handley v. Lawley, 90 Ala. 527, 8 So. 101.

Plaintiff's testimony shows (and this is without dispute) when he stepped over the south rail of the track and attempted to take another step he discovered that his trousers were caught by some object. He then looked and saw the train approaching 75 yards from the crossing. If at the same time the fireman then saw the plaintiff on the track, the only negligence that could be imputed to him was a failure to alert the engineer. In these circumstances it would have required the length of time of at least one tick of the watch for the fireman to have warned the engineer. It required three seconds for the emergency brakes to be applied and take effect. By that time the locomotive would have been within 105 feet of the crossing. The evidence shows without dispute that it was then impossible for the train to have been stopped before the head of the train reached and passed over the crossing. Such failure under our decisions does not constitute actionable proximate negligence warranting a recovery for the consequence of plaintiff's hurt.

But the appellee insists that the jury was warranted in finding and did find that plaintiff's injury resulted from the negligence of the railroad company in not maintaining public crossing in reasonably safe condition for public travel. The evidence is certainly without dispute that the plaintiff was not standing on the crossing in front of the approaching train at the time the head of the engine reached and passed over the crossing. If he had been he would not have been found west of the public road. It is also without dispute that plaintiff's injury consisted of a traumatic severance of his right foot from his leg just above the ankle, the severance of his right arm midway between the elbow and the shoulder, the bruising of his left heel and the severance of some of his fingers. The undisputed evidence shows that the surface of the dirt road at the crossing was level with the top of the rails; that the pilot of the engine overhung the rails 5 inches and the bottom of the pilot was three and one-fourth inches above the ball of the rail. The cylinders of the locomotive overhang the rails 31 inches, 15 inches above the rail and the cylinder cocks and rigging for their operation extend to within 10 inches of the top of the rails. The main driving rods overhang the rail 6 inches and the counterbalances on the drivers overhang the rails 4½ inches. The last mentioned parts of the machinery in case of revolution come within a few inches of the rails.

If, as plaintiff testified, his right foot was caught and tied to the crossing within six or eight inches of the south rail and he threw his body with his head to the west outside of the south rail to save himself, in such proximity thereto to traumatically sever his right arm by the wheels of the locomotive between the elbow and shoulder, his face and body were bound to be immediately longside the south rail in juxtaposition thereto. It also follows as a neces-

sary logical conclusion that his right leg, his foot being tied to the crossing six or eight inches inside the rail, would have been on the rail up to the knee at least. It is clearly apparent that in these circumstances the pilot, which is designed and placed on the locomotive to sweep the rails clear, would have swept the plaintiff's body from the track, out of range of the drivers or the poney trucks and would have probably broken every bone in his body. That the plaintiff was in the position where his testimony placed him is also refuted by the physical facts as to the nature of his injuries above stated and the further fact that when he was found soon after the train passed, he was on the west side of the public road in the gutter south of the south rail. He undertakes to account for this position by his own testimony going to show that after he recovered from his unconsciousness resulting from shock of his injury, he attempted to get up and walk home and floundered around and fell into the ditch. The evidence further shows and without dispute that flesh and blood were on the south rail immediately north of where plaintiff's body was found. The plaintiff in argument undertakes to account for this on the theory that this flesh and blood was caused by plaintiff's floundering and falling west of the crossing.

Among the items of evidence offered on the trial and now before us as exhibits to the record are a number of photographs taken shortly after the alleged injury about a week or ten days and the wire cable with a piece of cloth in between two of the wires. The cable consists of six wires 1/16th of an inch in diameter. The photographs offered by the plaintiff in evidence are numbered. Plaintiff's Exhibit 2 shows one prong of the wire cable protruding above the ground according to the evidence about an inch and a half. Exhibit No. 5 discloses 5 prongs of the cable level with the surface of the treadway on the public road crossing. There is a small piece of fabric in between two of the wires. Plaintiff's exhibit 6, greatly enlarged or taken at very close range, shows one of the prongs of the cable protruding slightly above the surface with this piece of fabric between the protruding wire and the other wires, which are level with the surface of the roadway, said fabric being apparently packed into the earth. There is an absence of evidence showing that any part of the bottom of plaintiff's trousers were torn away. The cloth between the wires can be removed from between the wires with slight effort. It overtaxes judicial credulity to believe that this wire could have held a full grown man pinned to a crossing in the face of eminent danger or death as the wire itself and the photographs thereof appear before us. The story is too fantastic to be believed.

We are, therefore, at the conclusion and hold that the verdict of the jury was contrary to the great weight of the evidence and was the probable result of sympathy engendered by the nature of plaintiff's injuries and his sufferings while he was in the hospital as detailed by the medical testimony. The court erred in overruling the defendant's motion for a new trial.

I am, therefore, of the opinion that for the errors noted the judgment should be reversed and the cause remanded.

Reversed and remanded.

## PER CURIAM.

We concur in the result. We are of the opinion that the case was one for the jury's consideration as to each count. As to count one, we think the question of proximate cause was for the jury.

We are persuaded, however, that the motion for a new trial on the weight of the evidence should have been granted and we confine our concurrence, therefore, upon the matter of a new trial.

GARDNER, C. J., and FOSTER, LIVINGSTON, LAWSON, SIMPSON, and STAKELY, JJ., concur.